# United States Court of Appeals
### For the Eighth Circuit

———————————————

No. 18-1890

———————————————

United States of America

*Plaintiff - Appellee*

v.

Jose Sanchez

*Defendant - Appellant*

——————————

Appeal from United States District Court
for the Western District of Arkansas - Hot Springs

——————————

Submitted: January 16, 2019
Filed: April 3, 2020

——————————

Before BENTON, MELLOY, and KELLY, Circuit Judges.

——————————

MELLOY, Circuit Judge.

An Arkansas state trooper stopped Jose Sanchez while he was driving a pickup truck without license plates shortly after midnight. After confirming that Sanchez had no driver's license, no criminal history, and no outstanding warrants, the trooper continued to hold Sanchez and conducted a canine sniff of the truck. In addition, the trooper crawled on the ground to look at the truck's undercarriage. From the ground,

the trooper saw a black plastic bag located above a spare tire, seized the bag, and arrested Sanchez.

Sanchez moved unsuccessfully to suppress evidence seized from the vehicle's undercarriage, arguing a lack of reasonable suspicion to extend the traffic stop. Following denial of his suppression motion, Sanchez entered a conditional plea of guilty to one count of possession of 50 grams or more of actual methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii). Sanchez appeals the denial of his motion to suppress, and we affirm.

## I. Background

Shortly after midnight on May 26, 2016, Arkansas state trooper Derek Nietert stopped Sanchez on Interstate 30 near Malvern, Arkansas. Nietert stopped the truck because it had no license plates and he could not read its paper tags. Once Nietert stopped the truck, he noticed that the paper tags had recently expired. Sanchez was traveling with Vanessa Fuentes, who was in the passenger seat, and their two "very small children," who were in the backseat. Nietert testified that Sanchez looked "concerned" when Nietert approached the vehicle. Sanchez spoke little English, so Nietert mostly communicated through Fuentes, who told Nietert that the driver was Jose Sanchez and that neither of them had a driver's license. Nietert testified that he believed they produced an insurance card bearing a different individual's name. Nietert realized the vehicle was at an unsafe location where a guardrail left little space between the vehicle and fast-moving traffic, so Nietert asked Sanchez to drive ahead to an exit. Sanchez did so.

At the second location, after riding the short distance alone in the truck with Sanchez and the children, Fuentes explained to Nietert that they had borrowed the vehicle from Sanchez's friend and were traveling from Dallas, Texas, to Little Rock, Arkansas, so that Sanchez could complete a two-to-three-day job painting a house.

-2-

Fuentes did not know the truck owner's name. She stated they would be staying at a hotel, but did not know which hotel.

Nietert asked Sanchez to step out of the vehicle. Sanchez did so, and despite the language barrier, Sanchez confirmed some of the statements Fuentes had previously relayed to Nietert. Sanchez did, however, indicate that his first name was Jimmy rather than Jose. In addition, Sanchez identified his friend Miguel as the owner of the vehicle.

Nietert thought it was suspicious that Sanchez would bring Fuentes and their two children to Arkansas for a short job. Nietert observed two suitcases in the rear of the cab. In addition, he noted that he saw only one gallon of paint in the truck's bed, with no brushes or other paint or equipment visible. When questioned further, Fuentes explained that Sanchez would be working alone, not as part of a crew, and she believed the materials and equipment for the project were being provided by the homeowner in Little Rock. Nietert also questioned Fuentes as to why she reported Sanchez's first name was "Jose" while Sanchez said his name was "Jimmy." From the video evidence, it appears that Fuentes told Nietert that Jimmy was a nickname. Also on audio from the same evidence, Nietert indicated when talking to Fuentes that the name on the insurance card did not match the owner's name as asserted by Sanchez.

Nietert radioed Sanchez's name and date of birth to perform a warrant check. Nineteen minutes into the stop, dispatch confirmed that Sanchez did not have a driver's license and did not have any reported criminal history. Outside the presence of Fuentes and Sanchez, Nietert summarized the information available and said, "It's

got the . . . hair on the back of my neck standing up for some reason. . . . I wanna search it."[1]

One minute after obtaining the results of the criminal history check, Nietert asked Fuentes for consent to search the vehicle and she declined. Approximately two minutes passed between the time that Fuentes declined to give consent and the canine sniff. Corporal Mike Bowman arrived and directed the canine. Before doing so, but after learning that neither adult had a license, the vehicle had expired tags, and the ownership was unknown, Bowman stated simply, "tow it." Nietert, in apparent explanation for why he had not simply called for a tow, responded that there were two babies present.

The canine sniff proceeded, and Bowman reported that the canine alerted. The officers began searching the vehicle's cab area. Approximately ten minutes into the search, Bowman crawled under the vehicle and indicated he had located something. Nietert went under the vehicle and saw through holes in the spare wheel that a black plastic bundle was secreted above the wheel. Nietert arrested Sanchez and removed the bundle, which was later determined to contain methamphetamine. Sanchez was charged with conspiracy to distribute methamphetamine, possession with intent to distribute methamphetamine, and traveling in interstate commerce with the intent to promote unlawful activity.

Sanchez moved to suppress the methamphetamine evidence. Prior to the suppression hearing, the government conceded that the canine sniff did not provide troopers with probable cause to search the vehicle because Bowman had not followed

---

[1]On the night of the stop, a civilian was riding along with Nietert at the behest of Nietert's superiors. Several of Nietert's comments as captured in the video appear to have been comments to the civilian. This same person exited Nietert's cruiser at the second location and is seen in the video at various times.

proper canine handling procedures. At the hearing, the government introduced dash camera footage of the traffic stop, and both Nietert and Sanchez testified.

Nietert testified that, before conducting the search, he was considering towing the vehicle because neither Sanchez nor Fuentes had a valid driver's license and neither was listed as the owner of the vehicle. He acknowledged that troopers do not always impound vehicles under these circumstances and that he had not yet decided whether to do so when he called for the canine unit. Nietert testified that, had the vehicle been impounded, troopers would have conducted an inventory search. Nietert admitted that he did not run the truck's VIN to check its ownership or determine if it had been reported as stolen. He indicated, however, that when vehicles have paper tags, VIN checks are often inconclusive as to ownership due to the recency of changes in ownership likely surrounding the issuance of paper tags.

Defense counsel questioned Nietert as to several aspects of the stop. Nietert admitted that he did not ask the name of the homeowner to confirm the information about a painting job. In addition, counsel suggested Nietert "wasn't concerned about Mr. Sanchez or Ms. Fuentes. You had them drive to another exit . . . And they were free to move about the truck while you were running Mr. Sanchez's information." Nietert responded the "[u]nder the special circumstances with the babies, . . . I hate to see them stressed out without their parents. So, yeah. I allowed that."

The district court denied Sanchez's motion to suppress, concluding that reasonable suspicion justified the length of the stop and that exterior visual inspection of the undercarriage did not require probable cause. The court also concluded that, upon seeing the black plastic bundle, officers had probable cause to seize the bundle. Sanchez entered a conditional guilty plea to the charge of possession with intent to distribute, reserving the right to appeal the denial of his suppression motion. He was sentenced to 63 months of imprisonment.

## II.  Discussion

Sanchez presses three arguments on appeal.  First, he asserts that the traffic stop was unreasonably prolonged, constituting an unlawful seizure.  Second, he argues that the troopers' examination of the vehicle's undercarriage was a search unjustified by probable cause.  Third, he argues that the troopers' manipulation and removal of the black plastic bags constituted a physical trespass—and therefore, a seizure—again unsupported by probable cause.  We conclude that reasonable suspicion existed and supported extension of the stop.  We also conclude that external, visual examination of the vehicle's undercarriage did not require probable cause.  Finally, discovery of the black plastic bundle secreted above the spare wheel added to the overall level of suspicion and provided the probable cause necessary to seize the bundle and arrest the occupants.

## A.  Reasonable Suspicion

The Fourth Amendment protects against "unreasonable searches and seizures," U.S. Const. amend. IV, and a traffic stop constitutes a seizure of the vehicle's occupants, Brendlin v. California, 551 U.S. 249, 255 (2007).  As such, a traffic stop must be justified by "reasonable suspicion . . . that criminal activity may be afoot." United States v. Arvizu, 534 U.S. 266, 273 (2002) (quotation marks and citation omitted).  "When an officer makes a routine traffic stop, the officer is entitled to conduct an investigation reasonably related in scope to the circumstances that initially prompted the stop."  United States v. Lyons, 486 F.3d 367, 371 (8th Cir. 2007) (quotation marks and citation omitted).  But even a lawful traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete [the] mission" of the seizure.  Illinois v. Caballes, 543 U.S. 405, 407 (2005).  "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns."  Rodriguez v. United States, 575 U.S. 348, 354 (2015)

(quoting Caballes, 543 U.S. at 407). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Id.

A delay that "prolongs—i.e., adds time to—the stop," id. at 357, to conduct investigatory actions unrelated to the purposes of the stop is impermissible unless it is supported by reasonable suspicion. Sanchez does not dispute that Nietert's initial decision to conduct the traffic stop was lawful. See United States v. Sanchez, 572 F.3d 475, 478–79 (8th Cir. 2009) (affirming validity of a stop based on officer's reasonable suspicion that temporary license plate violated state vehicle registration statute). Instead, he asserts that Nietert exceeded his authority by extending the seizure. The government concedes that the decision to conduct the canine sniff prolonged the traffic stop but argues the extension was supported by reasonable suspicion.

"[A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal. . . . [but] a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690, 699 (1996); see also Arvizu, 534 U.S. at 273; United States v. Dortch 868 F.3d 674, 680 (8th Cir. 2017) ("[O]ur review on this issue looks to the totality of the circumstances, 'allow[ing] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.'" (alteration in original) (quoting Arvizu, 534 U.S. at 273)). The reasonable suspicion inquiry asks "whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." United States v. Walker, 771 F.3d 449, 450 (8th Cir. 2014) (quotation marks and citation omitted)).

"The concept of reasonable suspicion is somewhat abstract," but "the likelihood of criminal activity need not rise to the level required for probable cause,

and it falls considerably short of satisfying a preponderance of the evidence standard." Arvizu, 534 U.S. at 274. Because the determination as to reasonable suspicion must be based on the "totality of the circumstances," id. at 273, courts may not view individual elements of suspicion in isolation. In fact, "Terry . . . precludes this sort of divide-and-conquer analysis." Id. at 274. Rather, we must view the individual elements in context, i.e., in light of one another, and give "due weight" to the officer's inferences when assessing the overall level of suspicion. Ornelas, 517 U.S. at 699. As such, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." Arvizu, 534 U.S. at 277.

The district court concluded that Nietert had reasonable suspicion based on several specific and interrelated facts. Viewing the facts collectively and in light of one another, and acknowledging that arguably innocent factors can be suspicious in context, we believe Nietert permissibly concluded there was a "particularized and objective basis" for suspecting that Sanchez was involved in wrongdoing beyond committing traffic violations. First, Nietert saw an out-of-state truck with paper tags driving in the middle of the night. Upon stopping the truck, he discovered neither adult in the vehicle had a driver's license and the paper tags were expired. Next, there was some confusion as to the name of the owner; Fuentes was unsure of the owner's real name, and the name on the insurance card did not match the information relayed to the officer. Nietert also learned that the purported purpose for the trip was a two-to-three-day painting job, but no supplies were present other than one can of paint. Nietert learned all of this after having his suspicion piqued by the fact that Sanchez and his partner gave different names (Jimmy and Jose) even if one name was later described as a nickname. Finally, Nietert thought it unusual that an unlicensed driver would bring small children and an unlicensed partner/significant other with him for the midnight travel in the unlicensed vehicle for a short term out-of-state job.

A reasonable officer could view this collection of facts as suspicious. A reasonable officer could find it inherently suspicious that someone would lend their

-8-

truck to unlicensed drivers, especially if one of those drivers could not readily name that owner. It is more suspicious that the owner of a vehicle would do so when tags are expired and the borrowers are driving out of state through the middle of the night. The act of lending a vehicle in such a situation suggests a fair amount of risk and possible future hassle for the drivers and the vehicle owner. An officer reasonably could expect clarity from drivers as to vehicle ownership and could view it as suspicious that drivers could not provide full details, especially when given the timing of the stop and the absence of drivers' licenses or current plates.

In addition, it is suspicious that, for a two-to-three-day painting job with supplies and paint waiting at the destination, a worker would throw in a single can of paint. The government argues the case is analogous to United States v. Murillo-Salgado, 854 F.3d 407, 416 (8th Cir.), cert. denied, 138 S. Ct. 245 (2017), where we upheld a finding of reasonable suspicion based in part on the officer's observation that the amount of wiring in the vehicle appeared insufficient to complete the job that was the stated purpose of the trip. Sanchez argues that the government's reliance on Murillo-Salgado is misplaced. Sanchez emphasizes that, unlike the passengers in Murillo-Salgado, who offered no explanation for their lack of equipment and materials, Fuentes explained that the necessary equipment was located at the job. The driver in Murillo-Salgado also provided conflicting information about his occupation and about who was paying for the rental vehicle.

Here, we agree with the government that the lack of sufficient painting equipment reasonably can be viewed as adding to the overall level of suspicion. As in Murillo-Salgado, ownership and control of the vehicle were unclear. Regardless, we do not believe it necessary to finely parse distinctions between the present case and Murillo-Salgado. See Ornelas, 517 U.S. at 698 ("It is true that because the mosaic which is analyzed for a reasonable-suspicion or probable-cause inquiry is multi-faceted, one determination will seldom be a useful precedent for another." (citation and internal quotation marks omitted)). Rather, a reasonable officer could

-9-

view the decision to bring along a single gallon of paint for a two-to-three day job as an awkward attempt to bolster a cover story. Giving due weight to the officer's interpretation of the situation, the explanation proffered by Fuentes does not dispel suspicion. In this regard, the reasonableness of different inferences and narratives flowing from the presence of one can, and the officer's permissible view of those narratives, is more convincing than arguable similarities or differences with the Murillo-Salgado case. We must give "due weight" to the officer's reasonable inferences and his discounting of the ostensibly innocent explanation as to the can of paint. Ornelas, 517 U.S. at 699.

Sanchez, no doubt, is correct that there are possible innocent explanations for these various individual factors, such as limited housing, transportation, or child-care options. But, as the Court has held, even though "each of these factors alone is susceptible of innocent explanation, and some factors are more probative than others[,] . . . together . . . they sufficed to form a particularized and objective basis." Arvizu, 534 U.S. at 277. We conclude that such explanations, in context, are neither conclusive nor consistent with the officers' reasonable skepticism.

These suspicious facts suggested to Officer Nietert the possible transportation of contraband, as demonstrated by his decision to call for the dog. This suspicion is consistent with the midnight drive and the apparent desire to avoid detection. Importantly, this suspicion better explains why the not-readily-identified owner of a vehicle would loan it to unlicensed drivers to take it out of state. And, the applicable standard, after all, is less than a preponderance of the evidence.

Finally, Nietert's statement that he wanted to search the truck because the situation made the "hair on the back of [his] neck stand[] up for some reason," does not show that his suspicion was insufficiently particularized. While it is true that an "officer's reliance on a mere 'hunch' is insufficient," Arvizu, 534 U.S. at 274, we do not view Nietert's comments to his ride-along passenger as an attempted articulation

-10-

of a legal standard. And for the reasons just discussed, we do not view Nietert as having acted on an "inchoate and unparticularized suspicion or hunch." United States v. Sokolow, 490 U.S. 1, 7 (1989) (citation and internal quotation marks omitted).

## B. Privacy Interest in the Vehicle Undercarriage/Seizure

We also conclude that, absent a physical trespass and during an otherwise lawfully extended stop, an officer may look at the undercarriage of a vehicle without probable cause. Officers commonly look through windows and glance at wheel wells when sizing up the scene of stop, often for a combination of safety and investigatory reasons. It is well established that motorists have no recognized privacy interest in the exterior of their vehicles, or the interior spaces visible to the public. See Texas v. Brown, 460 U.S. 730, 740 (1983) ("There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." (internal citations omitted)). And, officers may crouch and change position when conducting an exterior examination or use a flashlight to artificially illuminate the area being viewed. See id. ("[T]he fact that [an officer] changed [his] position and bent down at an angle so [he] could see what was inside [a] car is irrelevant to Fourth Amendment analysis. The general public could peer into the interior . . . from any number of angles; there is no reason [the officer] should be precluded from observing as an officer what would be entirely visible to him as a private citizen."); see also United States v. Bynum, 508 F.3d 1134, 1137 (8th Cir. 2007) ("The act of looking through a car window is not a search for Fourth Amendment purposes because 'a person who parks a car—which necessarily has transparent windows—on private property does not have a reasonable expectation of privacy in the visible interior of his car.'" (quoting United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995))).

Without controlling authority, Sanchez argues the undercarriage is distinct from the rest of the exterior, or the visible interior, of a vehicle because motorists do

not expect the public to view the undercarriage of their vehicles. Sanchez argues that because drivers would be surprised and concerned to see a stranger looking under their cars, there must exist a reasonable and recognizable expectation of privacy. But, the same could be said of the floor of a vehicle's interior when an officer must stand close to the vehicle to peer in or assume an awkward position to obtain a view. The sole test cannot be the level of concern a person would express at seeing a stranger in a parking lot looking in or under their vehicle.

Sanchez distinguishes "vehicle undercarriage" cases cited by the government as arising only in the context of border checkpoint stops. See, e.g., United States v. Rascon-Ortiz, 994 F.2d 749, 754 (10th Cir. 1993) ("The undercarriage is part of the car's exterior, and as such, is not afforded a reasonable expectation of privacy. The fact that [an officer] knelt down to look under the car does not alter this finding. An officer may shift his position to obtain a better vantage point without transforming a visual inspection into a search, even though the agent's purpose is to look for contraband."). But, the material holding in Rascon-Ortiz did not appear to depend upon the border checkpoint context. That context, of course, provided justification for the stop, but the court, "tak[ing] guidance from the relevant search and seizure law" held "the brief visual examination of the vehicle's undercarriage was not a search." Id.

Further, the parties cite no case in which our own circuit has distinguished the undercarriage of a vehicle as outside the scope of a permissible exterior examination. Cf. United States v. Sanchez, 572 F.3d 475, 477 (8th Cir. 2009) (noting the fact of an undercarriage examination without identifying its legality as an issue in the case, stating that an officer "looked at the undercarriage of the minivan and noticed fresh undercoating spray . . . . commonly used to conceal compartments in a vehicle's undercarriage for transporting illegal drugs"). And, although the Supreme Court has relied on a theory of physical trespass to strike the warrantless mounting of a GPS tracker on a vehicle's undercarriage, the Court has not held the simple act of viewing

a vehicle's undercarriage requires probable cause. See United States v. Jones, 565 U.S. 400, 407–08 (2012).

At the end of the day, and as a practical matter, drawing a line between permissible and impermissible areas of a vehicle's exterior that officers may observe absent physical trespass would seem wholly unworkable. Vehicle configurations vary substantially and officers' inspections of undercarriages will involve varying levels of physical contortion. A distinction that would permit officers to look in windows, crane their necks, stand on their toes, crouch to look in wheel wells, and shine flashlights at night but that would preclude them from looking "too far" under a vehicle is too difficult to articulate. Separating the undercarriage from the rest of the vehicle's exterior necessarily entails defining a subjective dividing line that will vary in each situation and leave officers little guidance as to the limits of their authority.

Finally, Sanchez argues that, even if officers could view the underside of the truck, they could not seize the black plastic bundle because, without physically invading the opaque wrapping, they could not have known its contents. Sanchez, therefore, characterizes discovery of the bundle as a physical trespass rather than an exterior vehicle examination. This argument overly discounts the permissible inferences arising from the cumulative information officers had received. Upon seeing through the openings in the spare wheel and noticing something wrapped in black plastic, this new information added to the totality of the circumstances already known to officers, raising the level of suspicion they possessed. See, e.g., United States v. Pulido-Ayala, 892 F.3d 315, 319 (8th Cir. 2018) (holding physical trespass into a vehicle constitutional when trespass occurred after officers received new information that provided probable cause). Here, before any physical trespass, officers possessed probable cause and, therefore, a legal basis for the subsequent seizure of the package. In fact, Nietert testified that he previously had encountered other motorists with contraband similarly situated. In this situation, officers did not need to know with certainty, or see, the contents of the bundle to have probable cause.

-13-

We affirm the judgment of the district court.


KELLY, Circuit Judge, dissenting.

Any extension of a traffic stop must be justified by "reasonable suspicion of criminal activity." Rodriguez v. United States, 575 U.S. 348, 358 (2015). Reasonable suspicion requires that a police officer "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant further investigation." United States v. Woods, 829 F.3d 675, 679 (8th Cir. 2016) (cleaned up); see also United States v. Arvizu, 534 U.S. 266, 273 (2002) (explaining that reasonable suspicion requires "a particularized and objective basis for suspecting legal wrongdoing" (cleaned up)). Moreover, any further investigation must be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 20 (1968). Viewing the evidence in its totality, the facts in this case do not meet these standards.

In my view, state trooper Nietert violated Sanchez's Fourth Amendment rights by extending the stop to conduct a canine sniff without reasonable suspicion of drug activity. Sanchez driving without a license in a borrowed truck with recently expired tags justified Nietert issuing a citation for traffic violations or impounding the truck until its owner arrived to collect it—but a canine sniff required more. A canine sniff goes beyond the "ordinary inquiries" incident to a traffic stop and requires "independent[]" justification. Rodriguez, 575 U.S. at 355, 357. Nietert's decision to extend Sanchez's detention could be justified only by reasonable suspicion that Sanchez was engaged in criminal activity that merited further investigation with a canine sniff. The officer's "unparticularized suspicion or 'hunch'" was not enough. See Terry, 392 U.S. at 27.

-14-

The district court concluded that Nietert had reasonable suspicion based on several specific facts. Nietert observed that Sanchez seemed concerned about being pulled over. He found it suspicious that Sanchez appeared to lack painting equipment beyond the single visible can of paint. He also thought it was odd that Sanchez would bring his girlfriend and children along for the trip. Nietert was also concerned that neither Sanchez nor Fuentes had a driver's license, that the vehicle belonged to someone else, and that the vehicle's paper tags were expired. Finally, the district court noted that the video footage appeared to show inconsistent answers from Sanchez and Fuentes regarding Sanchez's first name.

Individually, these facts are not inherently suspicious. But even when viewed collectively, they do not create a "particularized and objective basis" for suspecting that Sanchez was involved in wrongdoing beyond committing traffic violations. See Arvizu, 534 U.S. at 273. That Sanchez, who spoke very little English, appeared "concerned" about being pulled over by a state trooper is hardly surprising. Nietert testified that Sanchez's level of concern was consistent with how many people appear when stopped by police. See United States v. Jones, 606 F.3d 964, 967 (8th Cir. 2010) (per curiam) (finding that circumstances "shared by countless, wholly innocent persons" do not add weight to reasonable suspicion analysis). Nietert did not describe Sanchez as "nervous," nor did he witness any behavior that would indicate unusual nervousness. Absent "the kind of 'unusual,' 'exceptional,' or more objective manifestations of nervousness" that might support a finding of reasonable suspicion when combined with other specific facts, Sanchez's look of "concern" carries little to no weight. See United States v. Jones, 269 F.3d 919, 929 (8th Cir. 2001) (expressing skepticism "of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials").

Nietert also did not explain what was suspicious about Sanchez bringing Fuentes and his children along on the trip. Nietert acknowledged that they had

-15-

luggage in the truck, consistent with their account that they were taking a brief trip to Little Rock. And as the court notes, Sanchez's family might have been traveling together that night due to a lack of access to housing or childcare. In any event, there was no inconsistency between Fuentes's explanation of the trip's purpose and Sanchez's explanation. When Nietert questioned Sanchez outside of the vehicle and away from Fuentes, he confirmed (albeit with some difficulty due to the language barrier) that he was a painter and that he had borrowed the truck from his friend to perform a painting project in Little Rock. All of this was consistent with Fuentes's account. There is nothing in the record that would have objectively suggested that Sanchez's narrative was false. See United States v. Beck, 140 F.3d 1129, 1137 (8th Cir. 1998) (finding defendant's explanation for the trip was not suspicious where officer had "no reason to suspect that [the] explanation was untrue").

There was some inconsistency in how Fuentes and Sanchez described Sanchez's first name, but Nietert did not say this raised any suspicion when he testified at the suppression hearing. Fuentes readily provided a reasonable explanation when Nietert asked why she had said Sanchez's first name was Jose and Sanchez said his name was Jimmy. From the record, it appears Nietert accepted the explanation at the time, and understandably so.

The court places great weight on Nietert's observation that Sanchez appeared to lack sufficient painting equipment for the job he described. It is true that in United States v. Murillo-Salgado we upheld a finding of reasonable suspicion in part based on the officer's observation that the amount of wiring in the vehicle appeared insufficient to complete the job that was the stated purpose of the trip. 854 F.3d 407, 416 (8th Cir. 2017). But unlike the passengers in Murillo-Salgado, who offered no explanation for their lack of equipment and materials, Fuentes explained that the necessary equipment was located at the job site—a house in Little Rock. The driver in Murillo-Salgado also provided conflicting information about his occupation and

-16-

about who was paying for the rental vehicle. Here, there is nothing in the record that would have suggested that either Fuentes or Sanchez was being untruthful.

And although we must give "due weight" to an officer's reasonable inferences, we should not credit inferences that an officer never made. Nietert testified it "did not appear to [him] that they were going to do a paint job at all with just the one paint can." But he never testified that he believed the inclusion of one can of paint was a ruse or an effort to prop up a cover story. I would not rely on an inference the officer did not make—particularly when Sanchez provided a reasonable explanation for his lack of painting materials.

Finally, just before conducting the canine sniff, Nietert commented that the situation made the "hair on the back of [his] neck stand[] up for some reason"—just the type of nebulous misgiving, or "hunch," that is insufficient to create reasonable suspicion. See Terry, 392 U.S. at 27. I agree that Nietert's comment should not be viewed as an attempted articulation of a legal standard. But I also would not ignore it as it is evidence of Nietert's inability to articulate "a particularized and objective basis for suspecting legal wrongdoing." See Arvizu, 534 U.S. at 273 (cleaned up).

Considering the totality of the circumstances, I do not view the collection of facts in this case as creating reasonable suspicion that justified extending the traffic stop to conduct the canine sniff. Because the subsequent discovery of methamphetamine stemmed from this Fourth Amendment violation, the evidence seized should have been suppressed.

For these reasons, I respectfully dissent. I would not reach the other issues addressed in the court's opinion.

_____

-17-