# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-1191

_____

United States of America

*Plaintiff - Appellee*

v.

Jose Alberto Perez

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of North Dakota - Eastern

_____

Submitted: December 17, 2021
Filed: April 1, 2022

_____

Before SMITH, Chief Judge, GRUENDER and KOBES, Circuit Judges.

_____

SMITH, Chief Judge.

A jury convicted Jose Alberto Perez of two federal controlled substance offenses[1] and three firearms offenses.[2] Prior to trial, Perez filed a motion to suppress

_____

[1]Perez was convicted of (1) conspiracy to possess with intent to distribute and distribute a controlled substance, in violation of 18 U.S.C. § 2 and 21 U.S.C.

evidence alleging that the police search of his car violated his constitutional rights. The district court[3] denied Perez's motion. During trial, Perez objected to a comment that the government made during its closing argument and moved for a mistrial. The district court denied this motion as well. On appeal, Perez seeks reversal of the denial of his motion to dismiss and his mistrial motion. The district court did not err as to either ruling and we, therefore, affirm.

## I. *Factual Background*
### A. *The Traffic Stop*

On February 20, 2018, North Dakota Highway Patrol (NDHP) Trooper Brett Mlynar, while parked on a median on U.S. Highway 2, spoke to a driver who pulled up next to him. The driver reported a red sedan driving westbound in an eastbound lane near a rest area on Highway 2. The driver also said that someone was chasing the red sedan. Trooper Mlynar, with his drug-sniffing dog, K9 Castor, drove in the direction of the reported red sedan. He observed a red Chevrolet Impala at a stop sign at a rest area waiting to turn westbound onto Highway 2. Trooper Mlynar noticed the extremely dark tint on the Impala's windows. He believed that the Impala's windows were tinted darker than state law allowed. After the Impala drove past him, he initiated a traffic stop.

---

§ 841(a)(1) and (b)(1)(A), and (2) possession with intent to distribute a controlled substance, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1) and (b)(1)(A).

[2]Perez was convicted of (1) possession of firearms in furtherance of drug trafficking crimes, in violation of 18 U.S.C. §§ 2 and 924(c)(1)(A) and (c)(1)(B)(i); (2) possession of a firearm made in violation of the National Firearms Act, in violation of 18 U.S.C. § 2 and 26 U.S.C. §§ 5822, 5861(c), and 5871; and (3) possession of firearms and ammunition by a convicted felon, in violation of 18 U.S.C. §§ 2, 922(g)(1), and 924(a)(2).

[3]The Honorable Peter D. Welte, Chief Judge, United States District Court for the District of North Dakota.

Trooper Mlynar approached the Impala and spoke with the driver, Perez. Perez was wearing a black gaiter pulled down around his neck and a black glove on his left hand. Trooper Mlynar measured the window tint and determined that the tint violated state law. He asked Perez for identification, vehicle registration, and proof of insurance. Perez said he had no ID because he left his driver's license at a hotel in Nebraska. He then admitted that his license was suspended. He could not provide proof of registration or insurance and neither could his two passengers. The passengers gave discrepant answers as to the Impala's ownership.

Trooper Mlynar directed Perez to get out of the Impala and to come to his patrol car. Trooper Mlynar thought he saw Perez hiding or reaching for something as he was coming out of the Impala, so Trooper Mlynar ordered Perez to show his hands. Perez exited the Impala without incident. While they were walking to the patrol car, Trooper Mlynar asked Perez if he had any weapons on his person. Perez denied having any weapons and consented to a pat-down search. Trooper Mlynar found a knife with a four-inch blade in Perez's front pants pocket. Afterwards, Trooper Mlynar placed Perez in handcuffs but advised him that he was not under arrest. Trooper Mlynar conducted a second pat-down and found multiple cell phones and Perez's Texas driver's license taped to one of the phones.

Trooper Mlynar then escorted Perez to the front seat of his patrol car. Trooper Mlynar began asking Perez questions, and Perez admitted that he had driven the wrong way down the highway. He blamed his error on lack of familiarity with the area. Trooper Mlynar left Perez in the patrol car and returned to the Impala to speak with Perez's passengers. Their accounts did not match Perez's.

After returning to his patrol car, Trooper Mlynar received notice from the North Dakota Department of Emergency Services' Division of State Radio that Perez's Texas driver's license was suspended and expired. He also learned that Perez had an active, non-extraditable Colorado arrest warrant for drug charges. At that

-3-

point, Trooper Mlynar determined that he was going to charge Perez with driving with a suspended license.

Trooper Mlynar requested assistance from the Ramsey County Sheriff's Office. Trooper Mlynar told Perez that he would issue Perez a warning for the window tint violation. Trooper Mlynar asked Perez for consent for K9 Castor to sniff the Impala's exterior. Perez did not consent. Trooper Mlynar testified that it was NDHP protocol to request consent for a search prior to deploying a drug-sniffing dog, but to proceed with the search regardless.

Soon after Trooper Mlynar called for backup, another car drove up and parked in front of the Impala. The driver identified herself as Fran Redday. She told Trooper Mlynar that she wanted to take the Impala and drive its passengers home and that she would come back for her car later. She had no proof of ownership of the Impala or proof of permission to drive it. Trooper Mlynar denied her request.

Trooper Mlynar turned his attention back to Perez and informed him that he was under arrest for driving with a suspended license. Before moving Perez to the back seat of the patrol car, he did a third pat-down and discovered an empty holster tucked into the front waistband of Perez's pants. Inside Perez's pants pocket, Trooper Mlynar found a handkerchief with five .45 caliber bullets inside.

Ramsey County Deputy Ted Rainesalo arrived on the scene. Trooper Mlynar and Deputy Rainesalo directed Perez's passengers to exit the Impala. Trooper Mlynar deployed K9 Castor to sniff the Impala's exterior beginning on the rear bumper on the passenger side. He conducted an "initial free pass"—a search where the handler does not provide the dog any direction—going toward the front of the Impala. R. Doc. 195, at 166. During the initial free pass, he recognized that K9 Castor displayed alert behavior. He then conducted a "spin out" and began a "detailed systematic search"—a search where the handler taps the side of the car high and low to direct the

dog to check specific areas—on the passenger side. *Id*. Trooper Mlynar and the government's expert, NDHP Trooper Kyle Stern, testified that the initial free pass, the spin out, and the detailed systematic search were standard practices.

K9 Castor indicated that she had picked up a scent by laying down near the Impala's rear wheel on the passenger side. Based on her indication, Trooper Mlynar decided to do a physical search of the Impala. Deputy Rainesalo assisted. Between the front passenger seat and the center console, they found 24 grams of methamphetamine. Inside a duffle bag on the back seat, they found one gram of marijuana, 43 empty clear plastic bags, and a laptop computer. In the center console, they found two debit cards that did not belong to any of the Impala's occupants. On the floor of the back seat under a jacket, they found a short-barreled shotgun and five shotgun shells. On the floor of the back seat on the passenger side, they found a .45 caliber handgun with a bullet in the chamber and four bullets in the magazine. They also found multiple cell phones. The Impala's roof appeared to have been damaged by shotgun fire.

Trooper Mlynar contacted his supervisor, Sergeant Adam Dvorak, described what they found in the Impala, and explained that the registered owner was not present and that he did not know whether anyone present could take possession of the Impala. Sergeant Dvorak advised impounding the Impala. NDHP's impoundment policy states, in relevant part, "If the owner does not provide for the vehicle's removal and the vehicle constitutes a hazard, the officer must arrange for the vehicle's removal and [an inventory search form] shall be completed." R. Doc. 166-4, at 13. During his testimony, Trooper Mlynar agreed that "leaving [the Impala] on the roadside just posed a risk . . . that it could be taken by somebody who didn't have authority to take it" and that "it was probably a good idea not to leave it out in the middle of Highway 2." R. Doc. 195, at 117.

After speaking with his supervisor, Trooper Mlynar called a tow truck to take the Impala to the impound lot. Before the tow truck arrived, Trooper Mlynar conducted "a brief inventory" search at the scene in "low light conditions." R. Doc. 166-2, at 6. He testified that, at the time of the search, "[i]t was getting dark. The sun was setting." R. Doc. 195, at 114. He also testified that Perez was still in the back seat of his patrol car, that K9 Castor was in her kennel in the back of his patrol car, and that the tow truck was pulling up. During this first inventory search, he found no contraband.

Trooper Mlynar completed an NDHP inventory form, listing the reason for the hold on the Impala as "Pending Investigation." R. Doc. 179-1. At a state court hearing, when asked whether he was familiar with NDHP written protocols for inventory searches, he responded "not verbatim." R. Doc. 166-12, at 39. He testified in front of the magistrate judge that he was "[p]retty familiar with" the written impound procedures. R. Doc. 196, at 11. The Impala was towed to a fenced and locked impound lot. Trooper Mlynar followed the tow truck to the lot and confirmed that the Impala was locked before he left the lot.

Perez was arrested on state drug charges and for driving with a suspended license and booked into the local jail. During booking, a dispatcher fielded a call from a woman who said that she had heard that her car was involved in a traffic stop on Highway 2. When Trooper Mlynar returned her call, the woman said she was the daughter of the Impala's registered owner. He then called the registered owner, Clarine Young Bird, who lived approximately three hours from the scene of the traffic stop. Young Bird provided the following information: she verified that she owned the Impala; she said that her daughter had been using the Impala in Bismarck, North Dakota; she said that she did not know Perez nor his passengers; and she said that she had not given them permission to use the Impala. Although Young Bird's daughter told Trooper Mlynar that the Impala had been taken from a Bismarck parking lot, there was no report of the Impala having been stolen.

### B. *Subsequent Search of the Impala*

Four days after the traffic stop, Trooper Mlynar went to the impound lot and searched the Impala again because the first search had been rushed and he did not want to risk anything of value not being accounted for. During this second inventory search, he found two additional handguns, three plastic bags containing methamphetamine, and a cell phone behind the back rest of the back seat. After he found these items, he terminated the search and applied for a search warrant. Two days after the impound lot search, pursuant to a warrant issued by a state court, he searched the Impala a third time. He found more ammunition, 459 grams of methamphetamine, drug paraphernalia, and a stun gun. The Impala was later released to its registered owner.

## II. *Procedural Background*
### A. *Motion to Suppress*

In July 2018, Perez and his passengers were indicted by a federal grand jury. In October 2019, Perez filed a motion to suppress evidence. A magistrate judge held an evidentiary hearing in January 2020 and issued a report and recommendation in June 2020. Based on the evidence, and relying on *Rodriguez v. United States*, 575 U.S. 348 (2015), the magistrate judge denied Perez's suppression motion. The magistrate judge concluded that no Fourth Amendment violation occurred because the stop's continuation for the dog sniff did not unreasonably prolong the stop given the attendant facts, such as the lack of proof of registration, insurance, and ownership, and Perez's lack of candor.

As to the Impala's impoundment and the two subsequent searches, the magistrate judge held, "There is no evidence suggesting Trooper Mlynar did not properly follow the [NDHP's impound] policy's requirements for completing an inventory form or did not follow any other provision of the policy." R. Doc. 209, at 37. The magistrate judge concluded that it was reasonable under the policy for Trooper Mlynar to impound the Impala and, given the firearms and drugs found

during the first search of the Impala, that there was probable cause to seize it under *United States v. Sims*, 424 F.3d 691 (8th Cir. 2005). The magistrate judge determined that once the Impala was impounded, the warrantless search based on NDHP's inventory policy was justified.

The magistrate judge held, "Trooper Mlynar permissibly concluded there was a particularized and objective basis for suspecting Perez was 'involved in wrongdoing beyond committing traffic violations.'" R. Doc. 209, at 29 (quoting *United States v. Sanchez*, 955 F.3d 669, 675 (8th Cir. 2020)). The magistrate judge concluded that K9 Castor's sniff was lawful under *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). On the training of K9 Castor and Trooper Mlynar and K9 Castor's reliability, the magistrate judge held that "a preponderance of the evidence demonstrates K9 Castor's certification was adequate under the standards of *Florida v. Harris*[, 568 U.S. 237 (2013)]." R. Doc. 209, at 30.

On the search warrant for the Impala, the magistrate judge concluded that "the warrant application did not include material misstatements of fact and/or omissions of material facts about K9 Castor's reliability." *Id*. at 38. Lastly, the magistrate judge held that search warrants for the electronic devices found inside the Impala and the social media accounts for the individuals involved in the traffic stop did not lack particularity and were not overbroad.

The district court adopted the magistrate judge's report and recommendation without comment.

## B. *Motion for a Mistrial*

After the government's closing statement, Perez requested a sidebar and made the following arguments:

> I believe that [the government] made an improper comment on [Perez's] failure to testify. [The government] stated that evidence showed that . . . Perez was

selling drugs and that that was uncontroverted. Literally the only person who could controvert that would be . . . Perez. According to *Griffin v. California*, 380 U.S. 609 (1965)[,] and *U.S. v*[.] *Robinson*, 485 U.S. 25 (1988), there should be no comment by the prosecution in closing argument about the defendant's right to remain silent. To do so is improper[,] and I'm requesting a mistrial.

R. Doc. 305, at 30. The district court denied the motion, ruling that:

The [c]ourt finds . . . that the argument made by the United States was not a violation of the prohibition against mentioning the defendant's failure to testify. It did not approach that. It was . . . in reference to the evidence that was heard at trial from all witnesses and presented through all witnesses and exhibits. The objection is overruled.

*Id*. at 32.

### III. *Discussion*
### A. *Motion to Suppress*

Perez makes the following arguments regarding his motion to suppress: (1) the Impala was impermissibly seized, (2) the Impala was illegally impounded and searched following impoundment, (3) K9 Castor lacked the requisite accuracy and reliability to establish probable cause for the search of the Impala conducted after her sniff, and (4) the state court warrants were improperly issued because of omissions in the warrant applications and because the evidence supporting the warrants was the fruit of unlawful searches and seizures.

"A mixed standard of review applies to the denial of a motion to suppress evidence. We review the district court's findings of fact under the clearly erroneous standard, and the ultimate conclusion of whether the Fourth Amendment was violated is subject to *de novo* review." *United States v. Williams*, 777 F.3d 1013, 1015 (8th Cir. 2015) (internal quotation marks omitted). "This court will affirm the district

court's denial of a motion to suppress evidence unless it is unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, based on the entire record, it is clear a mistake was made." *United States v. Hogan*, 539 F.3d 916, 921 (8th Cir. 2008) (internal quotation marks omitted).

### 1. *Seizure of the Impala*

Perez argues that the Impala was impermissibly seized because the traffic infraction that formed the basis for the stop—the Impala's illegal window tinting—was resolved after he was arrested for driving with a suspended license. He argues that the Impala should have been released to Redday at that point. He contends that the magistrate judge incorrectly analyzed the continued seizure of the Impala under the reasonable-suspicion standard and that probable cause was the correct standard because Redday asked Trooper Mlynar to release the Impala to her. He argues that the district court erred by adopting the magistrate judge's analysis. We disagree and affirm.

"An officer conducting a traffic stop who discovers information leading to reasonable suspicion of an unrelated crime may extend the stop and broaden the investigation." *United States v. Woods*, 829 F.3d 675, 679 (8th Cir. 2016). "A delay that 'prolongs—*i.e.*, adds time to—the stop,' to conduct investigatory actions unrelated to the purposes of the stop is impermissible unless it is supported by reasonable suspicion." *Sanchez*, 955 F.3d at 674 (quoting *Rodriguez*, 575 U.S. at 357).[4]

The magistrate judge correctly applied the reasonable-suspicion standard in assessing whether the Impala was impermissibly seized under the totality of the

---

[4]The cases upon which Perez relies in arguing that probable cause is the correct standard—*Carroll v. United States*, 267 U.S. 132 (1925), and *Collins v. Virginia*, 138 S. Ct. 1663 (2018)—address the automobile exception outside the context of a traffic stop.

circumstances. *See United States v. Callison*, 2 F.4th 1128, 1132 (8th Cir. 2021) (holding that inconsistent answers to routine travel questions contributed to reasonable suspicion); *Sanchez*, 955 F.3d at 675 (concluding that the fact that someone would lend his car to unlicensed drivers, especially if one of those drivers could not readily name the owner, contributed to reasonable suspicion). Trooper Mlynar did not illegally seize the Impala because he justifiably extended the traffic stop.

### 2. *Impoundment and Second Inventory Search of the Impala*

Perez argues that the Impala was unlawfully impounded because a willing driver was available and that the impoundment did not follow NDHP's impound policy.

> The impounding of a vehicle passes constitutional muster so long as the decision to impound is guided by a standard policy—even a policy that provides officers with discretion as to the proper course of action to take—and the decision is made "on the basis of something other than suspicion of evidence of criminal activity."

*United States v. Le*, 474 F.3d 511, 514 (8th Cir. 2007) (quoting *Colorado v. Bertine*, 479 U.S. 367, 375 (1987)).

NDHP's impoundment policy states, in relevant part, "If the owner does not provide for the vehicle's removal and the vehicle constitutes a hazard, the officer must arrange for the vehicle's removal and [an inventory search form] shall be completed." R. Doc. 166-4, at 13. We conclude that Trooper Mlynar's decision to impound the Impala was guided by NDHP's policy and that the decision was made on the basis of something other than suspicion of evidence of criminal activity.

Trooper Mlynar was permitted to conduct a second inventory search of the Impala four days after it was impounded. The initial inventory search on the side of

-11-

the highway while he was waiting for the tow truck was rushed. Following impoundment, "[p]olice may conduct a warrantless search of a lawfully-impounded vehicle even in the absence of probable cause." *United States v. Kennedy*, 427 F.3d 1136, 1143 (8th Cir. 2005). "The central question in evaluating the propriety of an inventory search is whether, in the totality of the circumstances, the search was reasonable." *Id*. "[I]nventories pursuant to standard police procedures are reasonable." *South Dakota v. Opperman*, 428 U.S. 364, 372 (1976).

The propriety of a second inventory search is an issue of first impression for our court, but the Second Circuit addressed this issue in *United States v. Williams*, 930 F.3d 44 (2d Cir. 2019). The defendant in *Williams* had moved to suppress a loaded firearm found during a second inventory search of a rental car that he was driving on the day of his arrest. *Id*. at 50. Detectives had commenced an initial inventory search after they brought the defendant to the local jail to process his arrest and did not find any contraband. *Id*. at 51. After the defendant learned the rental car was going to be towed to the rental agency, he became alarmed and asked for his phone call. *Id*. A detective overheard him say "at a high pitch and fast pace," which the detective took to indicate that his "stress level was elevated," that the individual on the receiving end of the call needed to "'come get this car right now' because the police were 'looking to tow it.'" *Id*. This prompted the detectives to conduct the second inventory search, during which they found the firearm at issue. *Id*. at 51–52.

The defendant in *Williams* principally argued that the second inventory search was impermissible because the patrol guide in that case was silent as to the validity of multiple inventory searches. *Id*. at 55. Perez makes a similar argument. The Second Circuit rejected this argument, reasoning that every detail of search procedure need not be governed by a standardized policy and that "[a] police department's procedures must simply be adequate to 'safeguard the interests protected by the Fourth Amendment.'" *Id*. (quoting *United States v. Lopez*, 547 F.3d 364, 371 (2d Cir. 2008)). It held that the second inventory search did not run afoul of that principle, even if

such a search was not specifically provided for in the patrol guide. *Id*. We have similarly held "[r]equiring an officer to conduct an inventory search pursuant to 'standardized criteria' or an 'established routine' does not mean that the search must be made in a 'totally mechanical' fashion." *Kennedy*, 427 F.3d at 1143 (quoting *United States v. Petty*, 367 F.3d 1009, 1012 (8th Cir. 2004)).

The Second Circuit in *Williams*, acknowledging that "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" held that it was reasonable for detectives to conclude that the defendant's behavior "suggested a need to go back and check their work in connection with the inventory search that they had just performed." 930 F.3d at 55 (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). "[W]hether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case . . . ." *Cooper v. California*, 386 U.S. 58, 59 (1967). While here there was no tip that prompted Trooper Mlynar to conduct his second inventory search, his second search was also reasonable given the rushed circumstances of his first search.

We conclude that Trooper Mlynar's second inventory search was reasonable because it was done in accordance with the general police routine of taking an accounting of items in police custody to protect the owner's property and also to protect the police against disputes over unaccounted-for property.

### 3. *Search of the Impala After K9 Castor's Sniff*

Perez argues that K9 Castor lacked the requisite accuracy and reliability set forth in *Florida v. Harris* to establish probable cause for the search of the Impala conducted after her sniff.

"We review *de novo* the district court's legal determination of probable cause." *United States v. Gonzalez*, 781 F.3d 422, 429 (8th Cir. 2015).

> [T]he framework courts should use to determine whether a drug dog sniff is reliable enough to give police officers probable cause to conduct a search . . . . is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime."

*United States v. Holleman*, 743 F.3d 1152, 1157 (8th Cir. 2014) (quoting *Harris*, 568 U.S. at 248).

Our review of the record satisfies us that the government sufficiently established K9 Castor's accuracy and reliability such that her alert could supply probable cause to search.

> If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

*Harris*, 568 U.S. at 246–47. "This presumption may be overcome if a defendant can show, either through cross-examination or introducing his own fact or expert witness, the inadequacy of a certification or training program or that the circumstances surrounding a canine alert undermined the case for probable cause." *Gonzalez*, 781 F.3d at 429.

Perez's arguments about K9 Castor's certification and reliability testing and Trooper's Mlynar's training and handling lack merit. Though not trained by an outside organization, K9 Castor was certified using the same Polizeispuerhandpruefrung (PSP)-based certification protocol that the Wyoming Police Service Dog Association uses. She was also trained using a program that consists of 200 hours of training and that is approved by the North Dakota Peace Officer Standards Training Board. Lastly, the NDHP certification test requires

handlers to score 80 percent or higher on two written tests and the dog-and-handler team to pass a final test before initial certification. We find that K9 Castor has been certified by a bona fide organization. K9 Castor's reliability also passes muster because the record shows that before her certification tests, other dogs proofed the search area by ensuring that no other odors of controlled substances were present beyond what the certifying official had placed there.

In addition to challenging K9 Castor's certification, Perez argues that her sniff was unreliable because she has previously falsely indicated the presence of drugs during training. Her degree of accuracy, however, is higher than the accuracy rates of other drug-sniffing dogs which have been deemed reliable. *See Holleman*, 743 F.3d at 1157 (affirming the denial of a motion to suppress evidence discovered as a result of a sniff by a dog with 57 percent "in-field" accuracy); *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007) (affirming the denial of a motion to suppress evidence discovered as a result of a sniff by a dog with 54 percent in-field accuracy). This court in *Holleman* also considered the results of annual recertifications that occurred between the dog-and-handler team's initial certification and the search at issue. K9 Castor and Trooper Mlynar have similarly been recertified annually, which further supports a finding of K9 Castor's reliability.

Perez also argues that Trooper Mlynar impermissibly cued K9 Castor to lay down by tapping the passenger side of the Impala. Trooper Stern testified that tapping on a car is "just a way of guiding the dog to where they want that dog to search" as part of the systematic, detailed search portion of a sniff. R. Doc. 196, at 74. We are not convinced that K9 Castor was impermissibly cued before alerting and prompting the search at issue. Further, Trooper Mlynar's suspicions about Perez that developed before K9 Castor's sniff contributed to the circumstances which, viewed through the lens of common sense, would lead a reasonable person to believe that a search would reveal contraband or evidence of a crime. *See Holleman*, 743 F.3d at 1158; *Harris*, 56 U.S. at 248.

-15-

4. *State Court Search Warrants*

Perez argues that the state court search warrants were improperly issued under *Franks v. Delaware*, 438 U.S. 154 (1978), because they contained material omissions and because the evidence supporting the warrants were the fruits of an unconstitutional search and seizure.

> To prevail on a *Franks* claim the defendant[] must show: . . . . (1) that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause.

*United States v. Reinholz*, 245 F.3d 765, 774 (8th Cir. 2001).

> In determining if an affiant's statements were made with reckless disregard for the truth, the test is whether, after viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.

*United States v. McIntyre*, 646 F.3d 1107, 1114 (8th Cir. 2011) (internal quotation marks omitted). "Recklessness, however, may be 'inferred from the fact of omission of information from an affidavit . . . when the material omitted would have been 'clearly critical' to the finding of probable cause.'" *Id.* (alteration in original) (quoting *United States v. Mashek*, 606 F.3d 922, 928 (8th Cir. 2010)).

Perez argues that the warrant applications contained material omissions because Trooper Mlynar did not include "information regarding K9 Castor's reliability and his compliance with impound procedures." Appellant's Br. at 34. As to the first prong of the inquiry, "[t]here is no evidence that [Trooper Mlynar] omitted the facts with the intent to make, or in reckless disregard of whether the omissions made, the affidavit misleading." *United States v. Wilson*, 324 F. App'x 546, 548 (8th

-16-

Cir. 2009) (unpublished per curiam). And as to the second prong of the inquiry, even if Trooper Mlynar intentionally or recklessly omitted information about K9 Castor's reliability, Perez cannot show that an affidavit that includes that information could not support a finding of probable cause. We have found that K9 Castor's sniff was reliable and that the search conducted as a result of her sniff was supported by probable cause. *See supra* Part III.A.3. For that reason, the items found during that search are therefore not fruits of an unconstitutional search.

We have also concluded that Trooper Mlynar complied with NDHP's impound procedures. *See supra* Part III.A.2. The items found during the search of the Impala after impoundment are not fruits of an unconstitutional seizure.

Perez's arguments focus on Trooper Mlynar's omissions in his warrant applications, but a North Dakota Bureau of Criminal Investigation Agent applied for the warrants for the electronic devices found in the Impala; furthermore, a Bureau of Indian Affairs Division of Drug Enforcement Special Agent applied for the warrants for the social media accounts. To the extent that Perez argues that those warrant applications were deficient in the same ways as the warrant application filed by Trooper Mlynar, we reject his arguments for the same reasons.

### B. *Motion for a Mistrial*

Perez argues that the government's comment during its closing statement—"Remember the evidence is clear and it's uncontroverted. [Perez] and [his passengers in the Impala] had come to Spirit Lake to sell meth," R. Doc. 305, at 23—violated his right not to testify because he is the only person who could have rebutted that statement. Appellant's Br. at 38–39 (citing *United States v. Snook*, 366 F.3d 439, 444 (7th Cir. 2004) ("Comments that government evidence is unrebutted are improper only if the defendant was the only person who could have rebutted the evidence.")).

"It is well established that 'the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.'" *United States v. Gardner*, 396 F.3d 987, 988 (8th Cir. 2005) (alteration in original) (quoting *Griffin*, 380 U.S. at 615). We "review[] *de novo* whether the prosecutor has unconstitutionally commented on the defendant's failure to testify." *Id*. "When the prosecutor has neither directly commented on the defendant's silence, nor demonstrated an intent to draw attention to that silence, the issue is whether 'the jury would *naturally and necessarily* understand the comments as highlighting the defendant's failure to testify.'" *Id*. at 989 (quoting *Herrin v. United States*, 349 F.3d 544, 546 (8th Cir. 2003)). We evaluate the prosecutor's comments "in the context of the entire closing arguments and the evidence introduced at trial." *Id*.

Taking into account the context of the government's entire closing argument and the evidence presented throughout the trial, a jury would not have naturally and necessarily taken the government's remark as a comment on Perez's failure to testify. Prior to making the remark at issue, the government had summarized the types of firearms that were involved in the commission of the instant drug trafficking offenses and explained that the firearms were used in furtherance of those crimes. After making the remark, the government argued that Perez actually or constructively possessed those firearms and explained how he used them in the scheme with his passengers. Additionally, trial evidence included 1.5 pounds of methamphetamine, three firearms, and the corroborating testimonies of Perez's passengers.

A prosecutor may mention the absence of evidence contrary to guilt without commenting on the defendant's decision not to testify when the statements "were simply in reference to the strength and clarity of the government's evidence presented at trial." *United States v. Moore*, 129 F.3d 989, 993 (8th Cir. 1997), *as amended on denial of reh'g and reh'g en banc* (Dec. 16, 1997); *see also United States v. Emmert*, 9 F.3d 699, 702–03 (8th Cir. 1993) (explaining that comments that "'there is no

evidence,' 'no testimony,' [and] 'no explanation'" did not manifest an intention by the government to call attention to the defendant's failure to testify).

"A defendant must establish that 'a prosecutor's comment was both improper and prejudicial to the defendant's substantial rights' to obtain a new trial." *United States v. Sandstrom*, 594 F.3d 634, 661–62 (8th Cir. 2010) (quoting *Gardner*, 396 F.3d at 988). Not only was the government's comment not improper, but Perez also did not demonstrate that he suffered any prejudice from the government's remark. The district court instructed the jury as to the burden of proof and Perez's right not to testify. *See United States v. Patterson*, 684 F.3d 794, 798 (8th Cir. 2012) ("Any prejudice caused by the prosecutor's isolated comment was sufficiently cured by the district court's immediate statement to the jury and its final jury instructions."). Perez also addressed the burden of proof in his own closing argument. And the government suggested a curative instruction, which Perez declined.

Because Perez neither established that the government's comment was improper nor that he was prejudiced by the comment, we affirm the district court's denial of his motion for a mistrial.

## IV. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____