# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 06-3214

———————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District of |
| | * | Nebraska. |
| Felipe DeJesus Gallardo, | * | |
| | * | |
| Appellant. | * | |

———————

Submitted: June 14, 2007
Filed: July 31, 2007

———————

Before MELLOY, SMITH, and GRUENDER, Circuit Judges.

———————

MELLOY, Circuit Judge.

Felipe DeJesus Gallardo conditionally pled guilty to possession with intent to distribute cocaine. 21 U.S.C. § 841(a)(1) and (b)(1). The district court[1] sentenced him to fifty-two months in prison and ordered forfeiture of Gallardo's vehicle and nearly $4,000 in cash. Gallardo appeals the conviction, arguing that police officers illegally detained him, lacked voluntary consent to search his vehicle, exceeded the

_____

[1] The Honorable Warren K. Urbom, United States District Judge for the District of Nebraska, adopting the report and recommendation of the Honorable David L. Piester, United States Magistrate Judge for the District of Nebraska.

scope of that consent, and obtained self-incriminating statements from him absent a valid waiver of his <u>Miranda</u> rights. We affirm the judgment of the district court.

## I. BACKGROUND

On the morning of July 2, 2005, Nebraska State Patrol trooper Greg Goltz placed several signs along Interstate 80 near Giltner, Nebraska. The signs were a ploy: they warned drivers of an upcoming drug interdiction checkpoint that did not exist in the hope that drivers transporting narcotics would see the signs, take the Giltner exit in response, and engage in suspicious activity, whereby a watchful Goltz could stop their vehicles. Gallardo was driving eastbound on I-80 in a 2004 Nissan pick-up truck and passed the signs around 11 a.m. He exited the Interstate at the Giltner interchange, took a right on the intersecting state highway, turned around in the nearest driveway, and got back on the Interstate heading the same direction. As Gallardo did so, Goltz noticed that Gallardo's truck lacked license plates, in violation of Nebraska state law.

Goltz turned on the squad car's flashing lights, which activated the vehicle's in-car camera and microphones. Therefore, the entire stop and the parties' interaction was captured on audio and video. Goltz stopped the truck, approached it, and told Gallardo that he had been pulled over for not having license plates. They conversed primarily in English, although Gallardo's spoke in accented and broken English. Goltz asked Gallardo for his license and registration; Gallardo produced a Nebraska driver's license, a California identification card, and numerous documents, including proof of insurance and several invoices for vehicle maintenance work performed between December 2004 and May 2005. Each service invoice stated the mileage of the truck at the time of service. From these invoices and the current odometer reading on the vehicle, Goltz learned that Gallardo had put roughly 39,000 miles on the truck in the previous seven months.

Goltz instructed Gallardo to join him in the squad car while Goltz processed the information and paperwork. Upon questioning, Gallardo stated that he lived with his wife and two children in Fontana, California, and that he put the mileage on his truck while working on projects as a carpet and tile installer in California. Gallardo also explained that he had a Nebraska license because he had previously lived in South Sioux City, Nebraska, with a friend. Goltz asked about Gallardo's travel plans, and Gallardo said he was traveling to Sioux City to look for an apartment or trailer there; he was considering moving there for a brief period of time for his job. Gallardo said he planned to stay three or four days in Sioux City to find a home, then return to California. He said he was still unsure if he was going to make the temporary move to the Sioux City area.

During the encounter, Goltz contacted his dispatcher to request information regarding Gallardo and the vehicle. The dispatcher stated that Gallardo's Nebraska license and California identification were valid and that Gallardo owned the pick-up. Goltz also asked why Gallardo had exited at the Giltner interchange after passing signs indicating an upcoming drug checkpoint. Gallardo stated that he was hoping to stop off for food and gas; when he saw upon exiting that there were no businesses near the interchange, he turned around and got back on the Interstate.

After this exchange, the dispatcher called and informed Goltz that Gallardo's California address had been the site of a sizeable methamphetamine bust two years earlier, although Goltz also learned that Gallardo himself had no criminal record or outstanding warrants for his arrest. Goltz questioned Gallardo about the duration of his residency at that address in California, and Gallardo said that he had lived with his wife at the Fontana address for one-and-a-half years. The dispatcher also informed Goltz that California had issued valid plates to Gallardo, but they had not yet arrived. Goltz then voided the ticket he had written to Gallardo for failing to properly display license plates on the truck. Goltz returned Gallardo's paperwork to him, and Gallardo opened the squad-car door and began to exit the vehicle.

Goltz then called to Gallardo by name and asked, "Do you have a minute?" Gallardo said he did, and he returned to his seat in the vehicle. Goltz told him that Nebraska had been experiencing problems with vehicles carrying drugs and guns from California. Goltz then switched languages and attempted to speak to Gallardo in Spanish, a language with which Goltz's familiarity was limited. Goltz successfully asked Gallardo if he had any guns or drugs in the truck, to which Gallardo responded in the negative. The following exchange then ensued. The parties stipulated to the accuracy of the English translation of the audio transcription of the recorded conversation, which appears in brackets, although they apparently disagree as to whether a question mark or a period should follow Goltz's first sentence below:

> Goltz: *¿Yo, yo policía, yo policía buscar el carro?* [I, I police, I police search the car?]
> Gallardo: OK, go ahead.
> Goltz: Any *problemo*? [Any problem?]
> Gallardo: *Nada de problema.* [No problem at all.]
> Goltz: You *comprende*? [You understand?]
> Gallardo: *Sí.* [Yes.]
> Goltz: *¿No problemo?* [No problem?]
> Gallardo: *No problema.* [No problem.]
> Goltz: OK. *Gracias. Muchas gracias.* [OK. Thank you. Thanks a lot.]

Another trooper arrived at the scene, and he and Goltz proceeded to search the pick-up while Gallardo remained in the squad car. In less than ten minutes, Goltz had opened the hood and noticed an indentation in the engine's firewall area that had been filled with auto-body repair putty, then covered with fresh paint. Goltz, a trooper with seventeen years' experience, had seen similar firewall modifications in the past and associated them with hidden compartments for narcotics. He also noticed that the adjacent fender had been attached incorrectly using an electronic trunk-lock mechanism, possibly indicating a point of entry into what he increasingly suspected was a hidden compartment beyond the firewall.

Goltz arrested Gallardo and drove him to the Nebraska State Patrol office in nearby Grand Island. Another trooper took the truck to the State Patrol office, where officers dismantled part of the vehicle to gain access to the hidden compartment. Inside, they found thirty-one packages containing a total of approximately seventy-eight pounds of cocaine.

In the State Patrol office, Goltz attempted to inform Gallardo of the nature of the charges he faced and expressed his desire for Gallardo's cooperation. His tone was straightforward and informative, and he did not ask Gallardo any questions about the offense. Goltz also provided Gallardo with a waiver-of-Miranda-rights form written in Spanish. Gallardo read the form aloud, but expressed confusion regarding its meaning and did not sign it. Goltz was unable to clarify the kind of cooperation he sought from Gallardo, the nature of Gallardo's rights, or the significance of their waiver due to the language barrier. A fellow officer returned shortly thereafter with a Spanish-speaking agent from the United States Bureau of Immigration and Customs Enforcement ("ICE").

Gallardo re-read the Miranda waiver aloud, and the ICE agent answered his questions and described the significance of signing the form. The ICE agent also informed Gallardo that Gallardo could cease the officers' interrogation at any time and request the assistance of an attorney. Gallardo indicated that he understood his rights, the implication of waiving them, and the nature of the interrogation to follow. He signed the Miranda waiver. Officers then questioned Gallardo, and he made several self-incriminating statements.

The government charged Gallardo with possession of cocaine with intent to distribute. Gallardo moved to suppress the cocaine evidence, arguing that Goltz's search of the truck violated the Fourth Amendment because Gallardo's purported consent to the search was involuntary. He also moved to suppress his self-incriminating statements to officers, arguing that his waiver of his Miranda rights was

invalid.  The district court denied the motions.  Despite obvious language barriers between Goltz and Gallardo, the district court examined the videotape and the translated transcription of the encounter, as well as other circumstances, and found that "as a whole the circumstances show that consent [to search the truck] was voluntarily given without coercion."  The district court also found that Gallardo voluntarily and knowingly waived his <u>Miranda</u> rights because he had read the waiver form in Spanish, had the opportunity to ask questions with a Spanish-speaking agent, and was informed of his right to cease questioning at will and request an attorney.

Gallardo entered a conditional guilty plea preserving his right to appeal the denial of his motions to suppress evidence.  The district court sentenced Gallardo to fifty-two months in prison.  It also ordered forfeiture of the pick-up truck and nearly $4,000 that Gallardo had been carrying at the time he was arrested.

## II.  DISCUSSION

On appeal, Gallardo challenges the denial of his motions to suppress the fruits of the search and his subsequent statements to police.  We address the denial of each motion in turn.

### A.  The Search of Gallardo's Pick-Up Truck

With regard to motions to suppress evidence, we review a district court's factual findings for clear error and its determination of whether a Fourth Amendment violation occurred de novo.  <u>United States v. Olivera-Mendez</u>, 484 F.3d 505, 509 (8th Cir. 2007).

1. Whether Gallardo was Unlawfully Detained at the Time of Consent

Gallardo first challenges the extent of the stop, arguing that Goltz unconstitutionally questioned and detained him after Goltz had voided the traffic citation. Therefore, Gallardo contends, the unlawful detention invalidated any purported consent to the search of his truck. See Florida v. Royer, 460 U.S. 491, 507-08 (1983) (plurality opinion) ("Because . . . [the defendant] was being illegally detained when he consented to the search of his luggage, we agree that the consent was tainted by the illegality and was ineffective to justify the search.").

"A seizure that is justified solely [as a stop for a traffic violation] can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005). To prevail on this issue, Gallardo must prove (1) that he was in fact seized; that is, a reasonable person in Gallardo's position would not have felt free to terminate the encounter with Goltz after Goltz voided the traffic ticket and returned Gallardo's paperwork to him, Florida v. Bostick, 501 U.S. 429, 436 (1991); and (2) that Goltz lacked the requisite reasonable suspicion of other criminal activity to prolong Gallardo's detention after all tasks, inquiries, and paperwork related to the initial purpose of the stop had been completed. United States v. Sharpe, 470 U.S. 675, 682 (1985); Terry v. Ohio, 392 U.S. 1, 20-21 (1968). An officer has "reasonable suspicion" necessary to briefly detain a suspect if the circumstances show that the officer could "articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity" and possessed "at least a minimal level of objective justification for making the stop." Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000) (internal quotations omitted).

We find it unnecessary to address the question of whether Gallardo's continued conversation with Goltz after Goltz asked him if he "ha[d] a minute" occurred in the context of a seizure or a consensual encounter. Even assuming that a reasonable person in Gallardo's position would not have felt free to leave after Goltz concluded

all business relating to the initial purpose of the traffic stop, we find that a number of factors, taken together, supplied Goltz with reasonable suspicion to prolong Gallardo's detention to question him about narcotics trafficking.

During the traffic stop, Goltz discovered that Gallardo had put more than 39,000 miles on his truck in seven months. Gallardo's only explanation for the exceptionally high mileage over such a relatively short duration was that he occasionally had to travel from Fontana to other destinations in California for his employer. Gallardo was driving from California to Sioux City; Goltz, an officer of seventeen years' experience, knew that California was a regular source of illegal narcotics in the Midwest and Sioux City was a known destination for narcotics traffickers. Gallardo's asserted purpose of his trip—to drive from Fontana, California to Sioux City (a roundtrip of over 3,000 miles) solely to find an apartment, then immediately return to California—was not particularly credible, especially given the fact that Gallardo told Goltz that he was not looking for any particular kind of apartment in Sioux City but simply wanted "something cheap." To a reasonable person, this limited purpose would not justify a trip of such distance, particularly if the traveler states that financial efficiency is a factor in his decision-making. Finally, prior to any conversation with Gallardo about drugs, Goltz learned that law-enforcement authorities in California had made a large methamphetamine bust at Gallardo's California address two years earlier. Gallardo had no criminal record and he asserted to Goltz that he had not lived at that address at the time of the bust. Nevertheless, the temporal and physical proximity between Gallardo and a prior drug-trafficking operation at least raises a suspicion that Gallardo may have had some interaction or connection with the person or people involved in that operation.

We agree with the district court that this evidence, as a whole, provided "at least a minimal level of objective justification" for briefly extending Gallardo's detention after Goltz had already completed all tasks relating to the initial purpose of the stop.

Wardlow, 528 U.S. at 123. Gallardo was not unlawfully detained at the time Goltz asked for Gallardo's consent to search the truck.

## 2. Whether Gallardo Voluntarily Consented to the Search

The government bears the burden of proving the voluntariness of a suspect's consent to a search by a preponderance of the evidence. United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006). We review a district court's finding of voluntary consent for clear error, id., taking the "totality of all the circumstances" into consideration. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).

This case presents the threshold question of whether Goltz effectively communicated a request for Gallardo's consent to search the truck. Viewed out of context and looking only at the translated transcript of the conversation, one could understand Goltz's words—"I, I police, I police search the car"—to carry one of at least two different messages. Those words could constitute a declaration of Goltz's intention to search Gallardo's truck, regardless of Gallardo's consent or non-consent. If said with the proper inflection, however, they could alternatively constitute a request for permission to search Gallardo's truck.

The district court looked at Goltz's words in the context of the conversation, as well as examining the audio and video recordings of the entire encounter to determine Goltz's tone and manner of delivery. After doing so, the district court found that Gallardo would have (and did) interpret those words as a request for consent to search the truck. We have made the same examination, and we are satisfied that the district court's characterization of Goltz's message to Gallardo was not clearly erroneous. Goltz's mannerisms and the tone and delivery of his words clearly indicated that he was seeking a response from Gallardo; Goltz was not simply informing Gallardo of his imminent plans. The fact that Gallardo immediately responded affirmatively to Goltz—"OK, go ahead"—suggests that he viewed Goltz's words as a question rather

than a declaration. This interpretation is further supported by the context of the conversation. Goltz followed up on his initial question by asking Gallardo if he understood and by twice asking Gallardo for confirmation that Gallardo had no problems with it. Gallardo told Goltz that he understood, and that he had "no problem at all." Gallardo never expressed any doubts as to what Goltz was asking, and Gallardo's responses were clear and unequivocal. In sum, the totality of the circumstances provide support for the district court's determination that Gallardo understood Goltz's communication as a request for consent to search Gallardo's truck.

Having reached that conclusion, we turn now to the question of whether Gallardo's consent was voluntary. This analysis requires an examination of a number of factors, "[s]ome relat[ing] to the characteristics and behavior of the defendant, . . . [o]thers relat[ing] to the environment surrounding the defendant at the time he gave his consent, . . . [and s]till others relat[ing] to the interaction between police and the defendant in the encounter." Willie, 462 F.3d at 896. "No one factor is dispositive." Id.

As to those characteristics of Gallardo relevant to the voluntariness inquiry, we note that there is nothing in the record to suggest that Gallardo had knowledge of his constitutional rights at the time he consented to the search. Further, Gallardo's ability to communicate with Goltz was limited by the language barrier. These two facts weigh against a finding of voluntariness. See id. (noting that a defendant's "knowledge of his constitutional rights (whether from Miranda warnings in the encounter at issue or from previous interactions with police)" is a factor in determining voluntariness); United States v. Guerrero, 374 F.3d 584, 588-89 (8th Cir. 2004) (upholding a district court finding of involuntary consent when the defendants "were unable to communicate effectively and [the officer] was aware of the communication barrier").

-10-

Nevertheless, other characteristics make it unlikely that Gallardo's "will ha[d] been overborne and his capacity for self-determination critically impaired" at the time he gave consent to the search. United States v. Watson, 423 U.S. 411, 424 (1976) (quotation omitted, alteration in original). Gallardo was fifty-four years old. He had little formal education, but he held a job and supported his family. Gallardo did not appear intoxicated or impaired during his interaction with Goltz. In addition, Gallardo proved unafraid to assert himself or ask questions during the encounter; he asked Goltz not to ticket him for failing to display any license plates, he asked about alternatives to a ticket, and—after Goltz had voided the citation—he asked how to properly fill out follow-up paperwork after he received his plates. Taken together, Gallardo's relevant characteristics do not suggest an especially high vulnerability to police coercion.

In addition, the environment of the encounter was not inherently coercive. Although the discussion did take place in a squad car while Gallardo was arguably detained, that car was parked on the shoulder of a well-traveled Interstate highway during the middle of a summer day. This is far from a secluded or threatening location. Furthermore, the interaction with Goltz was straightforward and brief. Goltz's tone was serious but not aggressive. He made no intimidating gestures or statements and no promises or misrepresentations. Goltz did not break down Gallardo's will through incessant questioning over a long period of time; Goltz first asked for consent a mere twenty-five minutes into the initial stop, and Gallardo immediately agreed to allow the search.

Looking at the totality of these circumstances, the district court did not clearly err in finding that Gallardo's consent to the search was voluntary.

3. Whether Goltz's Search Exceeded the Scope of Gallardo's Consent

Gallardo further argues that a reasonable person would not have interpreted his exchange with Goltz as providing Goltz with sufficiently broad consent to search the engine compartment of the truck for drugs. See Florida v. Jimeno, 500 U.S. 248, 251 (1991) (stating that the scope of consent to a search is "generally defined by its expressed object" and determined by "what . . . the typical reasonable person [would] have understood by the exchange between the officer and the suspect[.]"). We disagree. The exchange left no doubt that illegal drugs would be the object of Goltz's search; immediately prior to asking for consent to search the vehicle, Goltz asked Gallardo several times if Gallardo had drugs in the truck. In addition, Gallardo placed no qualifications upon his consent. We have held that "the typical reasonable person" would understand a suspect's general consent to search a vehicle for drugs to include consent to open unlocked containers within the vehicle, id., access apparently false compartments, United States v. Ferrer-Montoya, 483 F.3d 565, 568-69 (8th Cir. 2007), and "search any part of the truck where [drugs] might be stored." United States v. Siwek, 453 F.3d 1079, 1085 (8th Cir. 2006). Goltz had the benefit of several years' experience in locating hidden compartments in vehicles used for drug trafficking as a state patrol officer, and this experience had shown that the engine compartment was a "part of the truck where [drugs] might be stored." Id. Given the above precedent, the acts of opening the hood and examining the engine compartment did not exceed Gallardo's unqualified consent to search the truck for drugs.

Gallardo also argues that he was deprived of an opportunity to withdraw or limit the scope of his consent after the search began because Goltz told him to sit in the squad car during the search. See United States v. Sanders, 424 F.3d 768, 774 (8th Cir. 2005) ("Once given, consent to search may be withdrawn . . . ."). We need not reach this argument. Even assuming that the searching officers had some independent duty to ensure Gallardo an opportunity to withdraw consent after the search began—and Gallardo offers no authority suggesting that such a duty exists—the facts

here do not compel the conclusion that Gallardo lacked such an opportunity. The squad car was parked immediately behind Gallardo's truck. Gallardo was not handcuffed, and he sat in the front seat of the squad car for the duration of the search. If Gallardo wished to withdraw his consent, there is no evidence that he was unable to do so—particularly because Gallardo made no attempt to attract the attention of the officers once the search began. Under these facts, Gallardo was at least obligated to make some effort to communicate an intent to withdraw his consent. He did not, and therefore we find Gallardo's argument on this issue to be without merit.

B. The Self-Incriminating Statements to Officers

Finally, Gallardo contends that the district court erred in failing to suppress self-incriminating statements he made to officers in the absence of counsel. Gallardo made these statements only after signing a waiver of his <u>Miranda</u> rights. "<u>Miranda</u> holds that the defendant may waive effectuation of the rights conveyed in the warnings provided the waiver is made voluntarily, knowingly, and intelligently." <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986) (quotations and alterations omitted). The "totality of the circumstances surrounding the interrogation" guide the determination of whether a waiver was voluntary, knowing, and intelligent. <u>Id.</u> (quotation omitted). Gallardo apparently concedes that he signed the waiver and answered subsequent questions voluntarily. He does, however, argue that the waiver was not knowing and intelligent. To make a knowing and intelligent waiver, the defendant must have "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Id.</u> To support his argument, Gallardo points to the language barrier and officers' allegedly inadequate or misleading explanation of the significance of waiving those rights prior to their custodial interrogation of Gallardo.

We agree that, in isolated instances, Gallardo showed confusion regarding "the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Id.</u> Looking to the totality of the circumstances, however, we believe the

-13-

evidence supports the district court's conclusion that Gallardo knowingly and intelligently waived his right to counsel.  First, Gallardo signed a <u>Miranda</u> waiver form written in his native language.  This fact alone carries significant weight in determining whether his waiver was knowing and intelligent.  <u>See</u> <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver . . . .").  Further, Gallardo did not sign the form automatically or absent-mindedly; he asked questions about its significance, read it aloud twice, and waited for a Spanish-speaking ICE agent to arrive before agreeing to waive his rights.  In short, he treated the waiver of his rights with appropriate caution.  Finally, the ICE agent clarified the nature of those rights and the significance of their waiver for Gallardo.  He told Gallardo that he could make no promises regarding leniency, that the sentencing decision was in the hands of the judge, that Gallardo would be subjecting himself to questions without an attorney, and "if . . . we are doing questions and you don't want to answer any more without an attorney, then you say, 'Listen, I don't want to answer more.'"  Gallardo then orally affirmed his desire to "answer questions . . . without attorney."

Given these facts, in their totality, we do not believe the district court erred in finding that Gallardo's <u>Miranda</u> waiver was knowing and intelligent.

## III.  CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

_____

-14-