# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-1647
_____

United States of America

*Plaintiff - Appellee*

v.

Jonathan Daniel Rooney

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of Nebraska - Omaha
_____

Submitted: November 16, 2022
Filed: March 28, 2023
_____

Before BENTON, KELLY, and ERICKSON, Circuit Judges.
_____

ERICKSON, Circuit Judge.

On May 16, 2020, Kozee Decorah was murdered on the Winnebago Reservation in Nebraska. Jonathan Rooney was charged with second degree murder and tampering with evidence related to Decorah's death. A jury acquitted Rooney of the murder charge but found him guilty of voluntary manslaughter, a lesser-

included offense, and tampering with evidence.  The district court[1] sentenced Rooney to a total term of 300 months' imprisonment.  Rooney raises three issues on appeal: (1) the denial of his motion to suppress custodial statements; (2) the sufficiency of the evidence on the manslaughter and tampering counts; and (3) the procedural and substantive reasonableness of his sentence.  We affirm.

## I.    BACKGROUND

On appeal from a judgment of conviction after a jury trial, we view the facts and all reasonable inferences drawn from those facts in a light most favorable to the jury's verdict. United States v. Galloway, 917 F.3d 631, 633 (8th Cir. 2019) (citation omitted).  Shortly before 8:00 P.M. on May 16, 2020, Kozee Decorah ("Decorah") called the Winnebago Police Department ("WPD") and reported she was stranded with her infant child, as her vehicle was stuck in the mud on Honey Creek Road. WPD Conservation Officer Peter Snowball ("Officer Snowball") was dispatched to search for Decorah.  Despite multiple attempts to reach Decorah by phone during the ensuing search, she was never heard from again.

Officer Snowball located an unoccupied vehicle on Honey Creek Road. Because of the difficult road conditions, Officer Snowball continued the search for Decorah on foot.  Shortly after 8:30 P.M., he requested Conservation Officer Benjamin St. Cyr's ("Officer St. Cyr") assistance.  Officer St. Cyr joined Officer Snowball and they searched for a while, returning to the WPD station shortly before 10:00 P.M.

After finding no one at Decorah's apartment, Officers Snowball and St. Cyr returned to Honey Creek Road where they met firefighters Jonathan Grant ("Grant") and Kyle Urbanec ("Urbanec") who had joined the search. The search team met by abandoned hunting cabins near Decorah's last known location.  Officer Snowball

---

[1]The Honorable Robert F. Rossiter, Jr., Chief Judge, United States District Court for the District of Nebraska.

noticed a fire burning near one of the cabins, so he and Urbanec entered the cabin. They found Rooney lying naked on a mattress with an infant, later identified as Rooney and Decorah's son. Rooney had cuts and abrasions on his arm, collarbone, shoulder, and face. Rooney was covering his eyes with his arms and squinting. He asked, "Where is she? Where's my clothes?" Officer Snowball did not see any clothes in the cabin. Rooney then asked, "Are you the rescue party?" Rooney told Officer Snowball that he had started a fire on the gas grill inside the cabin. Officer Snowball saw the grill with a piece of wood on it, but it did not appear to be on fire. Rooney informed the searchers that Decorah had gone outside to get cell service. Shortly after midnight, Officer Snowball informed dispatch that they had located Rooney and the infant.

Officer Snowball and Urbanec continued searching for Decorah. Still unable to locate her, they returned to the cabin and approached the nearby fire. While approaching the fire, Officer Snowball observed what he believed to be a skull and other bones protruding from it. Urbanec also saw the skull. They noticed the fire had a strange smell and began moving the skull with a stick to confirm what it was. When Urbanec flipped the skull over, Officer Snowball observed a righteye socket and nose, and the face's left half covered with a dark substance. Officer St. Cyr called Bureau of Indian Affairs Officer Anthony Walker ("Officer Walker"), alerting him that they had discovered possible human remains. Officer Walker then contacted the WPD Chief and the Federal Bureau of Investigation ("FBI").

Firefighter Grant drove Rooney and the infant to the WPD station where Rooney was detained in the back seat of a police vehicle, covered only with a blanket. Around 1:18 A.M., Officer Walker spoke with Rooney and asked him if he knew where Decorah was. Officer Walker did not advise Rooney of his Miranda rights because, as he later testified, he did not believe he was interrogating Rooney. Rooney, who appeared to be acting normally, told Officer Walker that he did not know Decorah's location. Officer Walker was aware of the report of possible human remains. At that time, the search party was still actively looking for Decorah.

Shortly after 3:08 A.M., FBI Agent Sam Roberts ("Agent Roberts") arrived at the WPD station and spoke with Rooney who was still wrapped in the blanket in the police vehicle. Agent Roberts did not advise Rooney of his Miranda rights, even though he admits Rooney was in custody. Agent Roberts asked Rooney about his and Decorah's history of domestic violence. Specifically, Agent Roberts inquired whether Rooney and Decorah fought frequently and whether Rooney ever "puts his hands on [Decorah]," which Rooney admitted to, and which was later corroborated by further investigation. Agent Roberts testified that although he did not intend on interrogating Rooney, he acknowledged the interaction constituted an interrogation.

After speaking with Rooney, Agent Roberts and the FBI evidence response team went to the crime scene. The FBI team processed the scene and collected several pieces of evidence, including the skeletal remains from the fire, a burned cell phone, a log with blood on it, and swabs of blood from the cabin. Law enforcement also found blood spatter on the cabin door. They also collected a cell phone, chainsaw, and gas can from the vehicle on Honey Creek Road.

Agent Roberts returned to the station around 5:23 A.M. and went to the vehicle to speak with Rooney again. He informed Rooney of his Miranda rights and Rooney signed a Waiver of Rights Form. The Miranda warning that Agent Roberts gave inadvertently failed to inform Rooney of his right to remain silent, although the written waiver did make such a disclosure. During the interrogation, Agent Roberts used a conversational tone and never threatened Rooney, but did reference Rooney's earlier admission that he sometimes hit Decorah.

Rooney recounted the events leading up to his detainment to Agent Roberts. After their vehicle had gotten stuck, Rooney reported that he found the cabin and started a fire on the grill, while Decorah went to get help. Rooney's clothes were wet from the rain, so he hung them up inside the cabin to dry. When Decorah returned to the cabin, she and Rooney began arguing. Rooney said the argument turned physical and Decorah hit him with something, so he pushed her out of the cabin and shut the door. According to Rooney, the next thing he was aware of was

the search party entering the cabin. Rooney also told Agent Roberts that on multiple occasions in the past, Decorah cut her wrists to the point of bleeding and blamed Rooney for it, hoping it would cause Rooney to lose custody of their children. Rooney spoke to Agent Roberts for about 30 minutes before asking, "Do I need a lawyer?" Agent Roberts continued his questioning until Rooney stated, "I want a lawyer," at which point the interrogation terminated.

Unaware that Rooney had asked for counsel, Officer Walker went to speak with Rooney at 6:18 A.M. After Officer Walker read Rooney his Miranda rights, Rooney told him that he had already spoken to Agent Roberts. Officer Walker explained that he and Agent Roberts worked with different agencies. Rooney spoke to Officer Walker without an attorney and made incriminating statements. Officer Walker maintained a conversational tone throughout the interaction with Rooney.

Rooney was kept naked, covered by the blanket, in the patrol vehicle the entire night because WPD did not have any jumpsuits at their police station and Agent Roberts did not want to interfere with any potential physical evidence on Rooney's person. The record reflects law enforcement initiated four encounters with Rooney during the early morning of May 17, 2020: (1) the first non-Mirandized conversation with Officer Walker at approximately 1:18 A.M. ("Statement One"); (2) Agent Roberts' non-Mirandized six-and-a-half-minute questioning that commenced at approximately 3:23 A.M. ("Statement Two"); (3) Agent Roberts' thirty-three minute questioning that commenced at approximately 5:35 A.M. after Rooney signed a Miranda waiver ("Statement Three"); and (4) Officer Walker's questioning that commenced at 6:18 A.M. after he advised Rooney of his Miranda rights, which Rooney waived ("Statement Four").

An autopsy was performed on the skeletal remains pulled from the fire near the cabins. Dental records confirmed they were Decorah. The pathologist noted that the remains were too burned to determine if any trauma occurred prior to the burning of the body. DNA testing identified the blood on the cabin door, on the floor, and on the log as Decorah's.

-5-

Rooney moved to suppress the four statements he made to law enforcement. The magistrate judge found, as relevant to this appeal, that the government met its burden of proving that Agent Roberts' failure to provide Rooney Miranda warnings prior to obtaining Statement Two was not a deliberate, calculated, or intentional use of a two-step interrogation process designed to circumvent the law. The magistrate judge also found that Statement Three followed Rooney's knowing and voluntary waiver of his Miranda rights. Rooney objected to the magistrate judge's report and recommendation. After *de novo* review, the district court, while agreeing with Rooney and the magistrate judge that several aspects of the case were troubling, found no error in the magistrate judge's thorough analysis under governing Supreme Court and Eighth Circuit precedent. The district court ruled that Statement One was inadmissible, but the government could introduce Statement Three in its case-in-chief and Statements Two and Four could be used as impeachment evidence.

At sentencing, the district court calculated an advisory Sentencing Guidelines range of 135 to 168 months' imprisonment. The government moved for an upward variance to the statutory maximums of 180 months on the manslaughter conviction and 240 months on the tampering conviction, to run consecutively. The court sentenced Rooney to 120 months' imprisonment on the manslaughter conviction and a consecutive 180 months' imprisonment on the tampering conviction. Rooney appeals, asserting a violation of his rights under Miranda v. Arizona, insufficiency of the evidence, and an error in calculating his Sentencing Guidelines range resulted in a substantively unreasonable sentence.

## II.    DISCUSSION

### A.    Motion to Suppress

We review the district court's denial of a motion to suppress applying a clear error standard of review to findings of fact and a *de novo* standard of review to conclusions of law. United States v. Perez, 29 F.4th 975, 983 (8th Cir. 2022). "This court will affirm the district court's denial of a motion to suppress evidence unless

it is unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, based on the entire record, it is clear a mistake was made." Id. (internal citation omitted).

Miranda warnings "are required when interrogation is 'initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" United States v. New, 491 F.3d 369, 373 (8th Cir. 2007) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)). A suspect is entitled to these warnings prior to undergoing a custodial interrogation "when an officer's interaction with the suspect is 'likely to elicit an incriminating response.'" United States v. Torres-Lona, 491 F.3d 750, 757 (8th Cir. 2007) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). If a suspect makes a knowing and voluntary waiver of his Fifth Amendment rights after receiving Miranda warnings, his inculpatory statements are admissible at trial. See Oregon v. Elstad, 470 U.S. 298, 309 (1985).

In Missouri v. Seibert, the Supreme Court held that if officers question a suspect in two parts and delay reciting the Miranda warnings to induce a confession, any statements made after the warnings are inadmissible. 542 U.S. 600, 604 (2004). The Seibert plurality identified different factors for determining whether to admit a post-Mirandized statement made during a two-part interrogation, such as the timing and content of the different stages of questioning. Id. at 615-16. Justice Kennedy wrote separately in Seibert, to express the view that the Court's reasoning should apply only to the intentional use of a two-step interrogation process to circumvent Miranda. Id. at 622 (Kennedy, J., concurring). However, if there has been no calculated effort to elicit a confession, our court has stated that the admissibility of a post warning statement is governed by Elstad. Torres-Lona, 491 F.3d at 757-58 (citing Elstad, 470 U.S. 298 and Seibert, 542 U.S. at 622). Our precedent treats Justice Kennedy's concurrence as controlling because it provided the fifth vote necessary for a majority and was decided on narrower grounds than the plurality opinion. Id. at 758.

The circumstances here are distinguishable from Seibert. Agent Roberts' first interrogation of Rooney was brief (only six-and-a-half minutes), took place while the search for Decorah was ongoing, and neither Agent Roberts nor Officer Walker had any strategy to induce a confession when speaking with Rooney. Also significant to the analysis is the two hours that elapsed between Agent Roberts' initial interrogation of Rooney and his second Mirandized interrogation. These two interrogations were not close enough in time to constitute a single, indistinct event "formally punctuate[d]" by Miranda warnings "in the middle." See Seibert, 542 U.S. at 601 (plurality opinion). The Supreme Court has explained that a substantial break in time and circumstances might be sufficient as a curative measure because it allows the accused the opportunity to distinguish the two contexts and appreciate that the interrogation has taken a new turn. Id. at 622 (Kennedy, J., concurring) (citation omitted). These differences are determinative, and the admissibility of Rooney's post-Miranda statements is governed by Elstad rather than Seibert. See Elstad, 470 U.S. at 309.

Rooney next challenges the district court's determination that his Miranda waiver was knowingly and voluntarily made. There are "two distinct dimensions" to the inquiry of whether a suspect's waiver of his Miranda rights was voluntary, knowing, and intelligent. United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id. (citation omitted). Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. (citation omitted). We consider the totality of the circumstances in determining whether a suspect's waiver is valid.[2] Id. (citation omitted).

_____

[2]The dissent emphasizes a number of facts in isolation rather than viewing the totality of the circumstances in opining that Rooney's motion to suppress should be granted. While the dissent correctly notes some factors that may weigh in favor of Rooney, the totality of the circumstances indicates that Rooney's will was not overborne.

-8-

While Agent Roberts' omission of an essential part of the Miranda warning in the oral presentation to Rooney is troubling, the totality of the circumstances demonstrates that Rooney knowingly waived his Miranda rights. First, Rooney signed a Miranda waiver form and "[t]his fact alone carries significant weight in determining whether his waiver was knowing and intelligent." United States v. Gallardo, 495 F.3d 982, 991 (8th Cir. 2007) (citation omitted). Second, Rooney had past interactions with law enforcement and "[a] history of interaction with the criminal justice system supports an inference that an interviewee is familiar with his constitutional rights and that his statements to the police are voluntary." Vinton, 631 F.3d at 482 (citation omitted). Third, the district court accepted the magistrate judge's finding that Rooney had no recorded vulnerabilities or mental impairments and was not intoxicated nor under the influence of any substances. Finally, Rooney speaks English and there were no apparent issues with him understanding what he was being asked or with what he was saying. Importantly, Rooney demonstrated an understanding of his rights when he unequivocally asked for a lawyer after thirty-three minutes of questioning. There is no error, clear or otherwise, in the district court's factual finding regarding the validity of Rooney's waiver.

The totality of the circumstances also supports the district court's determination that Rooney voluntarily waived his Miranda rights. Some of the factors we consider include: "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." United States v. Magallon, 984 F.3d 1263, 1284 (8th Cir. 2021) (citation omitted). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." Id. (citation omitted). Essentially, "a waiver is involuntary if under the totality of the circumstances 'the defendant's will was overborne.'" United States v. Harper, 466 F.3d 634, 643 (8th Cir. 2006) (citation omitted).

Agent Roberts' interrogation was conversational. Nothing in it indicates that it was abusive, extreme, coercive, or such that Rooney's will was overborne. The duration of the interrogation was not excessive, lasting only 33 minutes. See Perry v. Kemna, 356 F.3d 880, 886 (8th Cir. 2004) (one hour and one-and-a-half hour interviews were not excessive in duration). Other factors also weigh in favor of voluntariness. Rooney is an adult, high school graduate who suffers from no known impairments. See, e.g., United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005) (finding that the fact that the defendant was not a minor, had completed the eleventh grade, had at least some prior experience with the criminal justice system, and did not have difficulty understanding the questions put to him weighed in favor of the voluntariness of his confession).

While Rooney argues the evidence of involuntariness is compelling because he was handcuffed, forced to sit in the back seat of the police cruiser, given nothing to eat or drink, and only covered by a blanket during the five hours in question, we are required to consider the totality of the circumstances. Being handcuffed in the backseat of a police vehicle does not compel a finding of involuntariness. See Magallon, 984 F.3d at 1284-85 (totality of the circumstances supported a finding of voluntary waiver while defendant was handcuffed in the backseat of a police car). Rooney was not kept under these conditions in an effort to overbear his will. He was covered by the blanket because, as the jury found, he had burned his clothes, and the police had no other clothing to give him, not even a prison jumpsuit. The decision to keep him like this was also to ensure that Rooney did not have an opportunity to wash off or tamper with any evidence that might be on his body. On these facts and circumstances, we conclude that Rooney's waiver of his Miranda rights was voluntary. Considering all the circumstances surrounding the ongoing search for Decorah and conditions in which Rooney was held and questioned by law enforcement, the district court did not err in denying Rooney's motion to suppress.

## B.  Sufficiency of the Evidence

"We review the sufficiency of the evidence *de novo*, viewing the evidence and credibility determinations in the light most favorable to the jury's verdict and reversing only if no reasonable jury could have found the defendant guilty." United States v. Ganter, 3 F.4th 1002, 1004 (8th Cir. 2021) (citation omitted).  A conviction can be based on circumstantial or direct evidence and "need not exclude every reasonable hypothesis except guilt."  United States v. Seals, 915 F.3d 1203, 1205 (8th Cir. 2019) (quoting United States v. Tate, 633 F.3d 624, 628 (8th Cir. 2011)).

A conviction for manslaughter requires proof that: (1) Rooney voluntarily, intentionally, and unlawfully killed Decorah; (2) Rooney acted in the heat of passion caused by adequate provocation; (3) the killing occurred within the Winnebago Indian Reservation; and (4) both Rooney and Decorah are Native American.  See 18 U.S.C. § 1112; United States v. Chase, 451 F.3d 474, 479 (8th Cir. 2006).  To prove obstruction of justice by destroying evidence, the government was required to prove that Rooney: (1) altered, destroyed, mutilated, or concealed an object, namely a cell phone, his clothing, or Decorah's body; (2) acted knowingly; (3) acted corruptly; and (4) acted with intent to impair the object's integrity or availability for use in an official proceeding.  See 18 U.S.C. § 1512(c)(1).

A close review of the record establishes that a jury could have reasonably concluded that Rooney was guilty of manslaughter.  The jury heard evidence that Rooney and Decorah were the only two adults present at the cabin; that Decorah's blood was found both inside and outside the cabin; that Rooney had scratch marks on his face and upper body; and that Rooney and Decorah were fighting in the time leading up to her death.  While Rooney offers alternative theories as to what caused Decorah's death, including that Decorah accidentally killed herself via self-harm or that she lit herself on fire, the jury was empowered to resolve the factual dispute as to how Decorah's remains ended up in the fire.  There was sufficient evidence for the jury to find that Rooney put Decorah's body in the fire, which destroyed any evidence of cause of death.

-11-

There was also sufficient evidence for the jury to find that Rooney destroyed Decorah's cellphone and his clothes in the fire. Decorah's cell phone was never located, but it is indisputable that Decorah had a cell phone when her vehicle got stuck because she placed a cellular call seeking help. The government presented evidence indicating an item in the burn pit found alongside Decorah's remains was believed to be a cell phone. Rooney's clothes were never found, even though he claimed he hung them up at the cabin to dry. It was for the jury to weigh the evidence and make credibility determinations.

Viewing the evidence in the light most favorable to the verdicts as we must, there is more than sufficient evidence to support each conviction.

## C.    Sentencing

"We review a sentence in two steps, first reviewing for significant procedural error, and second, if there is no significant procedural error, we review for substantive reasonableness." United States v. Ayres, 929 F.3d 581, 582-83 (8th Cir. 2019) (citation omitted). When considering procedural error, the district court's factual findings are reviewed for clear error and its application of the guidelines *de novo*. United States v. Quiver, 925 F.3d 377, 380 (8th Cir. 2019) (citation omitted). The substantive reasonableness of a sentence is reviewed under the highly deferential abuse of discretion standard. Id. (citation omitted).

In sentencing decisions, "a district court may rely on undisputed factual allegations in the Presentence Investigation Report (PSR), reliable evidence introduced by the parties, and, to some extent, its own judicial experience; however, sentencing courts may not engage in speculation or draw inferences unsupported by the record." United States v. Harrell, 982 F.3d 1137, 1140 (8th Cir. 2020) (cleaned up). The district court stated that it was astounded and disturbed by the callous manner in which Rooney disposed of the mother of his children without any visible remorse. The court elaborated about the events, including the setting of an "extremely intense fire," which Rooney listened to burn and "smelled its smells

while lying in a blood-spattered cabin with [his] infant child a few feet from where [he was] trying to erase any evidence of Miss Decorah's existence." Rooney argues the court's statements about his state of mind are unsupported assumptions and are impermissible under United States v. Stokes, 750 F.3d 767, 771-72 (8th Cir. 2014) and United States v. Kane, 639 F.3d 1121, 1131-32 (8th Cir. 2011).

Stokes and Kane are distinguishable from this case. Here, the district court described the act of burning Decorah's body as "callous disregard for human life." It is far from purely speculative or unsubstantiated to describe a man who killed his girlfriend, the mother of his three children, and subsequently disposed of her body by incineration as "callous." While the district court's comments were perhaps unnecessary, they do not rise to the level of pure speculation.

Even if we assume the district court's statements were entirely unsupported by the record, we consider whether its reliance on those statements was a "principal basis" for the sentences. See United States v. Durr, 875 F.3d 419, 421 (8th Cir. 2017) (quoting Stokes, 750 F.3d at 772); see also United States v. Corrales-Portillo, 779 F.3d 823, 834 (8th Cir. 2015) (declining to follow Stokes where "there is nothing in the record" to indicate that the district court's allegedly improper inference "was a principal basis" for the sentence). There is nothing in the record to indicate an improper inference was a principal basis for Rooney's sentences. The record shows that the district court carefully considered the 18 U.S.C. § 3553(a) factors, the entire case record, the parties' sentencing briefs, the Presentence Investigation Report, and letters of support from Rooney's family. Given the emphasis placed on these factors, the district court's views regarding the callousness of Rooney's crimes did not form a principal basis for the sentences.

Finally, Rooney's claim that his sentence was substantively unreasonable is unavailing. Under our deferential review, we are not entitled to overturn a sentencing decision simply because we might conclude a different sentence is appropriate. United States v. Foy, 617 F.3d 1029, 1038 (8th Cir. 2010) (citation omitted). The district court provided ample reasons for its determination. It started

with the advisory Guidelines range, determined that range was not sufficient under the circumstances of this case, detailed at length the nature and circumstances of the offenses and the need to provide just punishment, and further determined the statutory maximum sentence was not warranted. We find no abuse of discretion.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

KELLY, Circuit Judge, dissenting.

At the heart of this case is Rooney's motion to suppress what has been described as Statement Three, which included inculpatory statements that Rooney made to FBI Agent Roberts during the second stage of a two-step interrogation process. While I agree that Oregon v. Elstad, 470 U.S. 298 (1985), governs the admissibility of Statement Three, I dissent from the court's determination regarding the validity of Rooney's Miranda waiver.

In the early morning hours of May 17, 2020, officers interrogated Rooney four times over the course of approximately five hours. After Rooney moved to suppress all four statements, the government agreed not to use Statements One, Two, and Four in its case-in-chief.[3] The "relevant inquiry" here is whether Rooney, before he was interrogated for the third time, "knowingly and voluntarily" waived his Miranda rights. Elstad, 470 U.S. at 309, 318. Agent Roberts initiated this interrogation of Rooney at about 5:30 a.m. Rooney sat naked, his lap covered only by a modest blanket, and he was handcuffed in the back of a patrol car, where he had been detained since about 1 a.m. Wearing an FBI badge and carrying a firearm, Agent Roberts stood outside the patrol car and read from a written Waiver of Rights form, advising Rooney that:

---

[3]The government agreed that it would not use Statement One for any purpose but stated that it would use Statements Two and Four for impeachment if he testified at trial.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during the questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

Agent Roberts also added that Rooney could "pass" on questions he did not wish to answer. Significantly, however, Agent Roberts did not advise Rooney of his right to remain silent. See Miranda, 384 U.S. at 444 ("Prior to any questioning, the person must be warned that he has *a right to remain silent*, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (emphasis added)).

Agent Roberts then presented the Waiver of Rights form—which fully described the Miranda rights, including the right to remain silent—to Rooney. But as Agent Roberts did so, he without pause directed Rooney to read aloud only the "Consent" portion of the form, which stated: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." Rooney complied and then signed the form. Agent Roberts immediately began the interrogation.

Elstad requires "a *careful and thorough* administration of Miranda warnings" to cure "the condition that rendered [a prior] unwarned statement inadmissible." 470 U.S. at 310–11 (emphasis added). Agent Roberts' verbal recitation of the Miranda warnings fell short of this requirement—he undisputedly omitted the critical right to remain silent. See Miranda, 384 U.S. at 467–68 ("At the outset, if a person in custody is to be subjected to interrogation, he must first *be informed in clear and unequivocal terms* that he has the right to remain silent." (emphasis added)); United States v. Bland, 908 F.2d 471, 474 (9th Cir. 1990) (holding that the Miranda warning

given to the defendant was "inadequate" because law enforcement "failed to mention" he "was entitled to have an attorney during questioning").

In concluding that Rooney's waiver was nevertheless valid, the court gives significant weight to the fact that Rooney signed the written Waiver of Rights form that included the right to remain silent. But the district court found that Agent Roberts "did not clearly communicate to [Rooney] what he was signing" and that there was "no indication in the record that [Rooney] actually read the rights advisory form before signing it." Indeed, all told, it took only about one minute for Roberts to read the form (incompletely) to Rooney, for Roberts to tell Rooney to read aloud and sign the Consent section, and for Rooney to do as he was instructed. As a practical matter, there was simply no time for Rooney to read the form in full. And, at best, on cross-examination, Agent Roberts testified that Rooney merely "had access to read" the form. This is insufficient. See Colorado v. Connelly, 479 U.S. 157, 168–69 (1986) (holding that the government bears the burden of proving the validity of a Miranda waiver by a preponderance of the evidence).

The court also relies on Rooney's history of interactions with law enforcement to find his waiver knowing and intelligent. But the advisement of the right to remain silent is "the threshold requirement for an intelligent decision as to its exercise." Miranda, 384 U.S. at 468. That Rooney had some experience with the criminal justice system cannot overcome the omission of this critical part of the Miranda warnings. See id. at 469 ("[W]hatever the background of the person interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time."); United States v. Longbehn, 850 F.2d 450, 453 (8th Cir. 1988) ("The requirement of Miranda warnings is not contingent either upon a defendant's actual or presumed knowledge of his rights or on his status [as a police officer] but, rather, must be honored in *all* instances of custodial interrogation.").

It is true, as the court notes, that Rooney later asked for a lawyer. But the right to a lawyer was a right that Agent Roberts *did* read to him. And the right to a lawyer was also included in the Consent section that Roberts directed Rooney to read out loud. The right to remain silent was not. Considering the totality of the circumstances,[4] I would find that the government did not carry its burden to establish that Rooney's <u>Miranda</u> waiver was knowingly made. Cf. <u>Gallardo</u>, 495 F.3d at 991 (concluding that the defendant's waiver was knowing and intelligent where he "did not sign the [<u>Miranda waiver</u>] form automatically or absent-mindedly; he asked questions about its significance, read it aloud twice, and waited for a Spanish-speaking ICE agent to arrive before agreeing to waive his rights"); <u>Vinton</u>, 631 F.3d at 483 (concluding that the defendant's waiver was knowing and intelligent, though he "could not read or write," where the record showed that law enforcement "read the waiver form out loud" and that the defendant signed the form and "indicated that he understood" its contents).

Because I would reverse the district court's denial of Rooney's motion to suppress, I respectfully dissent.[5]

_____

[4]Further, Rooney was handcuffed in the patrol car for about five hours, while naked and covered only by a small blanket, and he was not offered food, drink, or a restroom break. The court concludes that these facts do not compel a finding of involuntariness because Rooney was not kept in these conditions in order to overbear his will. But regardless of the reason for the conditions, no one disputes these were the conditions under which Rooney was interrogated. Nonetheless, there are "two distinct dimensions" to the inquiry of whether a suspect's waiver was valid, and because I would find that Rooney's waiver was not knowingly made, I do not reach the issue of whether his waiver was voluntary. See <u>Moran</u>, 475 U.S. at 421–22 ("Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." (citation omitted)).

[5]Accordingly, I would not reach Rooney's arguments that the district court relied on unsupported assumptions at sentencing or imposed a substantively unreasonable sentence.